UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 PROCEEDING |
| | ) | |
| ELTON TABOR, | ) | CASE NO. 15 B 26544 |
| | ) | |
| DEBTOR. | ) | HONORABLE PAMELA S. HOLLIS |

**NOTICE OF MOTION**

     PLEASE TAKE NOTICE THAT on **Tuesday, November 22, 2016, at 10:00 a.m.**, I shall appear before the Honorable Pamela S. Hollis, Bankruptcy Judge, in Courtroom 644, Dirksen Federal Courthouse, 219 S. Dearborn, Chicago, Illinois, or before any other Bankruptcy Judge who may be sitting in her place and present the **UNITED STATES TRUSTEE'S MOTION FOR SANCTIONS AND OTHER RELIEF**, a copy of which is attached and is served on you.

     /s/ Jeffrey S. Snell
     Jeffrey S. Snell, Trial Attorney
     United States Department of Justice
     Office of the United States Trustee
     219 South Dearborn, Room 873
     Chicago, Illinois  60604
     (312) 886-0890

## CERTIFICATE OF SERVICE

      I, Jeffrey S. Snell, state that pursuant to Local Rule 9013-1(D) the above **Notice of Motion** and the appended **UNITED STATES TRUSTEE'S MOTION FOR SANCTIONS AND OTHER RELIEF** were filed on October 6, 2016, and served on all parties identified as Registrants on the service list below through the Court's Electronic Notice for Registrants and, as to all other parties on the service list below, I caused a copy to be sent in the manner indicated below to the address(es) indicated before 5:00 p.m. on October 6, 2016.

                                                        /s/ Jeffrey S. Snell

## SERVICE LIST

**Registrants Served Through the Court's Electronic Notice For Registrants**

- Steven C Lindberg    bankruptcy@fallaw.com
- Marilyn O Marshall    courtdocs@chi13.com
- Michael Oreluk    slfecfmail@gmail.com

**Parties Served via First Class Mail:**

Elton Tabor
5944 W. 64th St.
Chicago, IL 60638

Elton Tabor
3419 N Kedzie Ave
Chicago, IL 60618

Robert V. Schaller
Schaller Law Firm P.C.
700 Commerce Drive, Suite 500
Oak Brook, IL 60523

Keevan Morgan
900 West Jackson Blvd., Suite 4
Chicago, IL 60607

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 PROCEEDING |
| | ) | |
| ELTON TABOR, | ) | CASE NO. 15 B 26544 |
| | ) | |
| DEBTOR. | ) | HONORABLE PAMELA S. HOLLIS |

**UNITED STATES TRUSTEE'S MOTION FOR SANCTIONS AND OTHER RELIEF**

NOW COMES PATRICK S. LAYNG, the United States Trustee for Region 11, by his attorneys, Jeffrey S. Snell, M. Gretchen Silver, and Elizabeth Brusa, and under 11 U.S.C. § 105 moves this Court to impose sanctions and afford other relief against attorney Robert V. Schaller. In support of his request, the United States Trustee states to the Court as follows:

### I. BACKGROUND

1. This is a core proceeding concerning the administration of the estate under 28 U.S.C. § 157(b)(2)(A) which this Court may hear and determine under Internal Operating Procedure 15(a) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

### II. FACTUAL ALLEGATIONS

#### A. Robert V. Schaller and the Schaller Law Firm, P.C.

2. Attorney Robert V. Schaller ("Schaller") is the founder, president, and sole owner of Schaller Law Firm, P.C. (the "Schaller Firm").

3. Schaller possesses and exercises management control over the Schaller Firm.

4. During 2015, attorney Michael N. Oreluk ("Oreluk") was an associate attorney employed by Schaller at the Schaller Firm.

5. During 2015, Schaller refrained from filing petitions through his own CM-ECF account and instead filed petitions using the CM-ECF account of Oreluk.

6. During 2015, Schaller actively marketed to potential clients whose homes were facing foreclosure.

7. By his own account, Schaller has practiced law for more than 29 years and has filed more than 2,700 bankruptcy cases.

### B. The Elton Tabor Bankruptcy Cases

8. Elton Tabor is approximately 86 years old and has experienced health issues in recent years. In 2015, Mr. Tabor twice sought relief from his debts under Chapter 13 of the Bankruptcy Code. Both bankruptcy cases were filed with the assistance of Schaller and his associate attorneys, and both cases were dismissed.

*Tabor I*

9. On February 13, 2015, Mr. Tabor filed his first voluntary petition for relief under Chapter 13 of the Bankruptcy Code, commencing Case No. 15 B 05335 ("*Tabor I*"). The *Tabor I* Petition bears the "/s/" signature of Oreluk. The *Tabor I* Petition, and all of the other documents filed on behalf of Mr. Tabor in *Tabor I*, were filed using Oreluk's CM-ECF account.[1]

10. Appended to the *Tabor I* Petition is a Rule 2016(b) Statement reporting the receipt of $1,000 from Mr. Tabor prior to the case filing, with a balance of $3,000 to be paid by the Chapter 13 Trustee. The Rule 2016 Statement bears the "/s/" signature of Oreluk above a signature block reciting Oreluk's position as an associate with the Schaller Firm. Accompanying the Rule 2016 Statement is a Court-Approved Retention Agreement signed by Mr. Tabor and Oreluk.

---

[1] There is cause to believe that Schaller filed the *Tabor I* Petition using Oreluk's CM-ECF account.

2

11. Neither the required schedules nor a plan was filed in *Tabor I*, and on June 3, 2015, the case was dismissed on the Chapter 13 Trustee's motion.

12. Contemporaneous with entry of the order dismissing *Tabor I* on June 3, 2015, the Court entered an order granting the Schaller Firm's application for compensation to the extent funds were available with the Chapter 13 Trustee. The Chapter 13 Trustee thereafter disbursed $2,432.70 to the Schaller Firm. Between the $1,000 prepetition payment from Mr. Tabor, and the $2,432.70 payment from the Chapter 13 Trustee, the Schaller Firm received $3,432.70 for compensation in *Tabor I*.

*Tabor II*

13. Approximately two months after entry of the order dismissing *Tabor I*, on August 3, 2015, Mr. Tabor filed his second voluntary petition for relief under Chapter 13 of the Bankruptcy Code, commencing the instant case, Case No. 15 B 26544 ("*Tabor II*"). The *Tabor II* Petition bears the "/s/" signature of Oreluk. The *Tabor II* Petition, and all of the other documents filed on behalf of Mr. Tabor in *Tabor II*, were filed using Oreluk's CM-ECF account.

14. Appended to the *Tabor II* Petition is a Rule 2016(b) Statement reporting the receipt of $1,000 from Mr. Tabor prior to the case filing, with a balance of $3,000 to be paid by the Chapter 13 Trustee. The Rule 2016 Statement bears the "/s/" signature of Oreluk above a signature block reciting Oreluk's position as an associate with the Schaller Firm. Accompanying the Rule 2016 Statement is a Court-Approved Retention Agreement signed by Mr. Tabor and Oreluk.

15. On August 17, 2015, Schedules A-J[2] were filed in *Tabor II*, reciting: $576,573 in real property on Schedule A; $8,120 in personal property on Schedule B; $1,268,380.27 in

---

[2] Copies of the Schedules are attached as <u>Exhibit A</u>.

3

secured claims on Schedule D; $124.82 in unsecured priority claims on Schedule E; and $80,218.39 in general unsecured claims on Schedule F. According to Schedule I, Mr. Tabor's total monthly income was $3,137.98, consisting of $2,250 in net income from rental property or operation of business, $800 in Social Security, and $87.98 in pension or retirement income. According to Schedule J, Mr. Tabor's total monthly expenses were $2,537.83 (of which $1,500 was rental or home ownership expense), resulting in $600.15 in monthly net income.

16. According to Schedule A, Mr. Tabor owned two separate properties on the petition date: a property located at 3419 N. Kedzie Ave, Chicago, IL 60618, with a value of $395,000 (the "Kedzie Property"), and a property located at 5944 W. 64th St., Chicago, IL 60638, with a value of $181,573 (the "64th Street Property"). According to Schedule D, the Kedzie Property was encumbered by a mortgage held by J.P. Morgan Chase in the amount of $998,081.18, and the 64th Street Property was encumbered by a mortgage held by Sun West Mortgage Company, Inc. in the amount of $270,299.09. According to Schedule G, Mr. Tabor derived $1,400 in monthly rent from the Kedzie Property, and $850 in monthly rent from the 64th Street Property.

17. According to Lines 4, 5, and 20 of Schedule J, Mr. Tabor's total monthly rental or home ownership expense was $1,500 as of the petition date. The Schedule does not make clear whether this monthly expense pertains to the Kedzie Property or the 64th Street Property, or both, or another property entirely. Lines 4a through 4d report that Mr. Tabor has no expense related to property taxes, insurance, upkeep or dues beyond what is included in the $1,500 on Line 4. According to the *Tabor II* Petition, the Kedzie Property was Mr. Tabor's residence.

4

18. According to information obtained from the Cook County Treasurer's Office, the 2015 real estate taxes for the Kedzie Property total $13,056.09, and the 2015 real estate taxes for the 64th Street Property total $847.06. (*See* Exhibits B and C.)

19. According to Schedule B, Mr. Tabor possessed $8,120 in personal property on the petition date, including:

   a. Cash on hand of $20.00 (Line 1);

   b. "bank account(s) with TCF Bank" with a $4,000.00 balance (Line 2);

   c. "miscellaneous household goods and furnishings--estimated value" of $850.00 (Line 4);

   d. "miscellaneous books, pictures, family photos, etc." with a value of $250.00 (Line 5);

   e. "wearing apparel" with a value of $775.00 (Line 6);

   f. "miscellaneous items" in the category of furs and jewelry with a value of $300.00 (Line 7);

   g. A pension with an unknown value (Line 12);

   h. A potential breach of contract claim against a former tenant with an unknown value (Line 21);

   i. a 2006 Ford Taurus valued at $1,625.00 (Line 25); and

   j. "miscellaneous assets, including any unliquidated tax refund(s), if any" valued at $300.00 (Line 35).

20. On August 17, 2015, a Chapter 13 plan was filed for Mr. Tabor providing that he would pay $600 per month for 60 months.[3] The plan provided for payment of the $3,000 in

---

[3] A copy of the plan is attached as Exhibit D.

5

estimated attorney's fees, the $124.82 priority unsecured claim listed on Schedule E, and the Chapter 13 Trustee's fees, with the remainder going to pay general unsecured creditors not less than 39% of the allowed amount of their claims. The plan did not provide for any payments on account of the Kedzie Property and/or the 64th Street Property. Indeed, the plan did not even acknowledge the existence of the secured claim held by Sun West Mortgage Company, Inc., and, as to J.P. Morgan Chase, provided in the Special Terms section that:

> 2. The Chapter 13 trustee shall make NO payments to mortgagee JPMorgan Chase on its secured claim in accordance with 11 U.S.C. §1325(a)(5)(A). Mortgagee holds a security interest in debtor(s)' real property listed in Schedule A and commonly known as 3419 N. Kedzie Ave, Chicago, IL 60618.

21.    On August 17, 2015, Mr. Tabor filed his Statement of Financial Affairs ("SOFA"). In response to Question 1, calling for income from employment or operation of business, Mr. Tabor reported:

| AMOUNT | SOURCE |
|---|---|
| $26,000.00 | 2015 YTD estimate (rental income) |
| $5,500.00 | 2015 YTD estimate (SSI) |
| $11,000.00 | 2014 estimate (SSI) |
| $0.00 | 2014 estimate (rental income) |
| $0.00 | 2013 TBD |

22.    On September 8, 2015, the Chapter 13 Trustee moved for dismissal of *Tabor II* citing Mr. Tabor's failure to begin plan payments and ineligibility for Chapter 13 relief due to the debt limit set forth under 11 U.S.C § 109(e).

23.    On September 23, 2015, the Court entered its order dismissing the case on the Chapter 13 Trustee's motion.

### C. Robert V. Schaller's Prefabricated Schedule B

24.    Upon information and belief, Schaller developed a standardized or prefabricated Schedule B that was in use throughout year 2015. This schedule contained standardized

6

descriptions and valuations for Lines 1, 4, 5, 6, 7, 8, 9, and 35, and the attorneys under Schaller's employ and supervision would then enter information unique to a particular debtor for some of the other fields, frequently Lines 2, 12, 25.

25. The Schedule B filed for Mr. Tabor was one of Schaller's prefabricated schedules. It contained the boilerplate representations for 1, 4, 5, 6, 7, 8, 9, and 35, and provided unique information in response to Lines 2, 12, 21, and 25.

26. Schaller, or an associate attorney in his employ and under his supervision, caused and allowed Mr. Tabor to execute the *Tabor II* Schedules under penalty of perjury.

### **D. The *Tabor II* Schedules I and J**

27. Upon information and belief, the Schedules I and J filed in *Tabor II* employed patently inaccurate figures to make it appear that Mr. Tabor could afford a $600 plan payment that he could not, in fact, afford over the 60-month term of the plan.

28. The majority of Mr. Tabor's monthly income reported on Schedule I – $2,250 (or approximately 71%) – was from the rental of real property. Schedule G indicates that $1,400 of this amount is rent from the Kedzie Property, and $850 is rent from the 64th Street Property. Of course, the continuation of this rental income is dependent upon Mr. Tabor retaining the properties, and neither the plan nor Schedule J appear to provide for that.

29. Schedule J indicates that Mr. Tabor's total projected monthly housing expense is $1,500.[4] While this figure may be believable if viewed in isolation, it is not remotely credible if it is supposed to capture all costs relating to the Kedzie Property and 64th Street Property. Even if J.P. Morgan Chase and Sun West Mortgage Company, Inc. reduced the principal balances owed

---

[4] This $1,500 payment is recited on Line 4 of Schedule H, and there are no expenses for taxes, insurance, maintenance, or association dues reported on Lines 4a – 4d. Additionally, there are no other mortgage payments reported on Lines 5 or 20.

7

for the Kedzie Property and 64th Street Property to $395,000 and $181,573, respectively (the values recited on Schedule A), the mortgage payments (assuming a 30-year amortization and 3% interest) would be substantially in excess of the amount budgeted on Schedule J. The monthly principal and interest for the Kedzie Property would be $1,665, and the monthly principal and interest payment for the 64th Street Property would be $766. In addition to these (optimistically low estimates for) principal and interest payments, there would, of course, be costs for real estate taxes, insurance, and maintenance. In short, there is no apparent way that Mr. Tabor could retain the Kedzie Property and 64th Street Property for $1,500 per month as budgeted in Schedule J, and, without these properties, there is no apparent way that Mr. Tabor could produce the $2,250 in rental income projected on Schedule I.

30.     Schedule I and J created the illusion that Mr. Tabor could make a $600 monthly plan payment. In reality, he could only make that payment for so long as the bankruptcy stay permitted him to collect rent from the Kedzie Property and 64th Street Property without paying the associated mortgages. As Schaller knew, however, it could take months for the secured lenders to obtain relief from the stay, and Mr. Tabor would be making plan payments in the meantime.

### E. Schaller's "Surrender Method" Chapter 13

31.     In or around 2013, Schaller began rolling out his "Surrender Method" of Chapter 13. A Surrender Method Chapter 13 case is an option Schaller sells to a desperate debtor whose home is in foreclosure and who cannot afford the monthly payment of a Chapter 13 plan that pays the mortgage and cures the mortgage arrearage over time. A Surrender Method plan does not attempt to save the debtor's house through the bankruptcy plan – indeed the plan provides that the house will be surrendered and/or that no payments will be made to the mortgage holder.

8

Rather, the theoretical idea behind the Surrender Method is that a debtor will save their home by negotiating a *pro se* loan modification with their lender.[5]

32. Although Schaller almost always uses the Court-Approved Retention Agreement (the "CARA") in Surrender Method cases, and although he is fully aware that Paragraph 16 has been interpreted to include negotiations with secured lenders,[6] he often causes Surrender Method clients to execute side agreements absolving him of any responsibility concerning the mortgage modification component of the approach he counsels. In other words, Schaller markets to prospective clients facing a challenge with a particular debt (their home mortgage); prospective clients seek Schaller's assistance in dealing with that challenge; and Schaller sells a substantial

---

[5] Of course, a debtor's prospects for successfully negotiating a loan modification would appear to be diminished by the fact that he or she is committing to a Chapter 13 plan that provides for payment of general unsecured creditors (whose claims would be discharged in a Chapter 7), thereby making funds unavailable for use in connection with the mortgage modification the debtor is attempting. One would think that a Chapter 7 discharge of all a debtor's general unsecured debts would place the debtor in a better position to negotiate a modification with a secured lender.

[6] *See In re Gage*, 394 B.R. 184 (Bankr. N.D. Ill. 2008). Among the matters at issue in *Gage* was Mr. Schaller's practice of entering into separate engagement agreements with clients to "negotiate a resolution of the foreclosure situation in an effort to avoid filing bankruptcy" contemporaneous with his execution of the then-Model Retention Agreement to represent the client in a Chapter 13 bankruptcy. In Mr. Gage's case, both engagement documents were executed on Saturday, April 14, 2007, in advance of the sheriff's sale of Mr. Gage's home scheduled for Tuesday, April 17, 2007. Mr. Schaller charged $997 for the forbearance negotiation, and the flat fee for the bankruptcy representation. The Court rejected

> Schaller's argument that all his work performed was not covered under the Model Retention Agreement or that the Model Retention Agreement should be narrowly construed to exclude the forbearance work simply because those services are not specifically detailed or mentioned in that document.

*Id.* at 194. The Court found that the forbearance work, performed after the Model Retention Agreement was executed, was covered under Paragraph 16 of the document, which provided that the attorney shall "[p]rovide any other legal services necessary for the administration of the case…." *Id.* Paragraph 16 of the Model Retention Agreement at issue in *Gage* is identical to Paragraph 16 of the CARA used in *Tabor I* and *Tabor II*.

9

number of the prospective clients a Chapter 13 bankruptcy case that proposes to resolve all debts *except the one that led them to him in the first place*.[7]

33. Upon information and belief, *Tabor I* and *Tabor II* were Surrender Method Chapter 13 cases.

34. Following dismissal of *Tabor II*, the Kedzie Property was sold through a foreclosure sale and a Judicial Sale Deed was executed February 10, 2016. (*See* Exhibit E.)

### III. ARGUMENT

35. The bankruptcy experience of Mr. Tabor provides an illustration of Schaller's predatory practices and the impact of those practices on financially vulnerable individuals.[8] Although neither *Tabor I* nor *Tabor II* ever got off the ground, Schaller received $4,432. And what did Schaller provide Mr. Tabor? Two petitions commencing Chapter 13 cases that Mr. Tabor was not eligible for, a fundamentally flawed Chapter 13 plan doomed for failure, and inaccurate sworn schedules. Mr. Tabor lost the Kedzie Property through foreclosure, and he received no relief from his $80,218.39 in general unsecured debt.

36. While the filing of the two petitions *may* have resulted from Schaller's ignorance of the debt limits of § 109(e), the filing of the Chapter 13 plan and inaccurate schedules were part of Schaller's deliberate practice. Schaller knew, or should have known, that the failure of the plan was a virtual certainty based on Mr. Tabor's financial circumstances. But, as with all

---

[7] Clients are, of course, relieved upon the case filing when the automatic stay cancels the sheriff's sale scheduled for their home. This relief is just temporary, however. In addition to causing clients to execute side agreements to the CARA, Schaller also causes his associate attorneys to read disclaimers to clients and record the client's acknowledgment with an audio device.

[8] It is possible that all of Mr. Tabor's interactions were with associate attorneys, and that he never met Schaller personally. This in no way alleviates Schaller of responsibility, however. *See*, *e.g.*, ABA Model Rule 5.1(c)(2). Moreover, it is Schaller who designed, implemented, and oversaw the use of Surrender Method Chapter 13 plans and prefabricated Schedule Bs.

10

Surrender Method cases, so long as the automatic stay remained in place long enough for Mr. Tabor to make several payments, the case would be a financial success from Schaller's perspective because, under the plan, Schaller's claim for attorney's fees was paid first after the Chapter 13 Trustee's administrative fee. And even if Mr. Tabor did not make the first few plan payments, Schaller's loss would be minimal because he did not have much time in the case anyway. Schaller saved time by, among other things, completing just a few fields of an otherwise prefabricated Schedule B. The circumstances of Mr. Tabor's cases illustrate the egregiousness of Schaller's self-enriching practices. Schaller's practices are an abuse of the bankruptcy system and warrant material sanction.

37.    Section 105 of the Bankruptcy Code provides the Court with authority to sanction attorneys and litigants in appropriate circumstances. *See In re Volpert*, 110 F.3d 494, 501 (7th Cir. 1997) ("[T]he plain language of § 105 furnishes the bankruptcy courts with ample authority to sanction conduct that abuses the judicial process…"); *In re Rainbow Magazine*, 77 F.3d 278 (9th Cir. 1996) ("By providing [in § 105] that bankruptcy courts could issue orders necessary 'to prevent an abuse of process,' Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* [501 U.S. 32 (1991)] recognized exists within Article III courts."); *In re Courtesy Inns*, 40 F.3d 1084, 1089 (10th Cir. 1994) (holding "that [§] 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers*."); *see also*, *In re Ezell*, 502 B.R. 798 (Bankr. N.D. Ill. 2013); *In re Varan,* 2014 WL 2881162, 2014 Bankr. LEXIS 2807 (Bankr. N.D. Ill. June 24, 2014). While courts must exercise caution in using § 105 to impose sanctions and should generally rely upon the authority provided by other statutory and procedural rules if sufficient for the situation, these authorities need not be applied "in a piecemeal fashion where only a broader source of authority

11

is adequate to justify all the necessary sanctions." *In re Rimsat, Ltd.*, 212 F.3d 1039, 1049 (7th Cir. 2000) (citing *Chambers*, 501 U.S. at 50–51). "Thus, a court may resort to § 105(a) and its inherent powers 'to ensure that all the culpable parties receive[ ] an appropriate sanction[.]'" *In re Varan*, 2014 WL 2881162, 2014 Bankr. LEXIS 2807, at *4 (quoting *In re Rimsat, Ltd.*, 212 F.3d at 1049 (citing *Chambers*, 501 U.S. at 50–51)).

38. On the facts of this case, the reach of § 105(a) is necessary to ensure that all culpable conduct is adequately addressed. While redress for the various offensive aspects of the conduct in Mr. Tabor's bankruptcy cases could be sought piecemeal through multiple motions,[9] the seriousness of the misconduct and judicial economy suggest that proceeding under § 105(a) is appropriate. Schaller violated the fiduciary obligations owed to Mr. Tabor,[10] and he severely abused the judicial process to enrich himself.

---

[9] For instance, the U.S. Trustee could proceed under Rule 9011 for the filing of the *Tabor II* Petition, but this motion would need to be brought separately from motions seeking relief under §§ 105, 329, and 526. *See* Bankruptcy Rule 9011(c)(1)(A).

[10] "When, in the course of his professional dealings with a client, an attorney places personal interests above the interests of the client, the attorney is in breach of his fiduciary duty by reason of the conflict." *In re Ezell*, 502 B.R. 798, 813 (Bankr. N.D. Ill. 2013) (quoting *Doe v. Roe*, 289 Ill.App.3d 116, 224 Ill.Dec. 325, 681 N.E.2d 640, 645 (1997)).

WHEREFORE, the United States Trustee requests the Court enter an order:

(A) Requiring Robert V. Schaller to refund all fees collected from, or on behalf of, Elton Tabor, for legal services rendered in *Tabor I* and *Tabor II*;

(B) Censuring Robert V. Schaller for his conduct in *Tabor I* and *Tabor II*;

(C) Requiring Robert V. Schaller to pay a fee of not less than $5,000 to the Clerk of Court to dissuade Schaller, and similarly situated attorneys, from engaging in the type of misconduct exhibited in *Tabor I* and *Tabor II*;

(D) Requiring Robert V. Schaller to reimburse the United States Trustee for his attorney fees and costs relating to this Motion; and

(E) Affording any other and further relief as is just.

                              RESPECTFULLY SUBMITTED,

                              PATRICK S. LAYNG
                              UNITED STATES TRUSTEE

Dated: October 6, 2016        /s/ Jeffrey S. Snell
                              Jeffrey S. Snell, Trial Attorney
                              M. Gretchen Silver, Trial Attorney
                              Elizabeth Brusa, Trial Attorney
                              United States Department of Justice
                              Office of the United States Trustee
                              219 South Dearborn Street, Room 873
                              Chicago, Illinois 60604
                              (312) 886-0890