UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 15bk26544 |
|  | ) |  |
| Elton Tabor, | ) | Chapter 13 |
|  | ) |  |
| Debtor. | ) | Judge Timothy A. Barnes |
|  | ) |  |

TIMOTHY A. BARNES, Judge.

<u>MEMORANDUM DECISION</u>

Before the court is the United States Trustee's Motion for Sanctions and Other Relief [Dkt. No. 26] (the "Motion") brought in the above-captioned case (the "Case") by the United States Trustee for the Northern District of Illinois, Patrick S. Layng (the "U.S. Trustee").[1] The Motion seeks sanctions against Robert V. Schaller ("Schaller"), counsel to Elton Tabor, the debtor in the Case (the "Debtor").[2]

For the reasons noted herein, the court finds that the U.S. Trustee has proven beyond a preponderance of the evidence that Schaller has failed to comply with the duties imposed upon him as an attorney practicing in bankruptcy matters before this court. The Motion will therefore be granted in the manner set forth herein.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern

---

[1]     This matter was originally assigned to Judge Pamela S. Hollis. It was transferred to the undersigned pursuant to an order dated April 3, 2017 [*See* Dkt. No. 49].

[2]     This is a contested matter governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). As a result, Bankruptcy Rule 7052 and thus Rule 52 of the Federal Rules of Civil Procedure (the "Civil Rules") applies. Fed. R. Bankr. P. 9014(c). This Memorandum Decision therefore constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and Civil Rule 52. Factual findings may be found and determined throughout this Memorandum Decision, not just in the "Findings of Fact" section. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

This matter was initiated pursuant to section 105 of the Bankruptcy Code. A bankruptcy court has statutory authority under section 105(a) as well as its inherent powers to impose sanctions for misconduct. *In re Rimsat, Ltd.*, 212 F.3d 1039, 1049 (7th Cir. 2000); *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997); *In re Husain*, 533 B.R. 658, 662 (Bankr. N.D. Ill. 2015) (Cox, J.), *aff'd*, 866 F.3d 832 (7th Cir. 2017). In such matters, the court has constitutional authority to enter final orders, as "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see also Zerand-Bernal Grp., Inc v. Cox*, 23 F.3d 159, 162 (7th Cir. 1994). Further, no party has questioned the jurisdiction of the court and the relief requested. *Wellness Int'l Network, Ltd. v. Sharif*, — U.S. —, 135 S. Ct. 1932, 1939 (2015); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The court therefore has both jurisdiction and constitutional authority to hear and determine this matter.

## BACKGROUND

The facts of this matter are essentially undisputed. It is the propriety of those facts that is at issue in this matter.

Schaller is the founder, president and sole owner of the Schaller Law Firm (the "Schaller Firm"). The Schaller Firm primarily represents consumers in bankruptcy matters. In that role, it marketed its services to clients who were facing sheriff sales of their homes. The U.S. Trustee takes issue with the Schaller Firm's practice in handling these cases.

Most notably, the U.S. Trustee condemns what it refers to as Schaller's surrender method (the "Surrender Method").[3] The Surrender Method is where Schaller targets individuals struggling to keep their homes, in many cases known to Schaller because of pending, public foreclosure actions. If an individual responds to Schaller's marketing efforts and hires Schaller, Schaller commences a chapter 13 bankruptcy case on the client's behalf. In such a case, the client, now a debtor in

---

[3]     Schaller does not prefer this appellation, referring instead to this course of action as a "cure and maintain plan … acceptance plan … surrender plan or full payment plan." Tr. at p. 80, Nov. 6, 2017. As "Surrender Method" is a much simpler term, the court will adopt its use herein.

bankruptcy, is obligated to propose a plan of repayment that treats all of the debtor's assets and liabilities, yet Schaller customarily proposes a plan that does not address the mortgage obligation or provide for the surrender of the debtor's home. Only when forced to do so does Schaller modify the deficient plan to address the home, in most cases surrendering the home to the mortgage holder. In taking on these representations, Schaller causes each debtor to sign an agreement that the debtor will attempt a *pro se* modification of the mortgage without Schaller's assistance and further acknowledges that, if the debtor is unable to get the modification, the Schaller Firm will acquiesce to a motion seeking to lift the automatic stay on the debtor's home when brought by the mortgage holder.

The U.S. Trustee maintains that the goal of the Surrender Method is to achieve, by application of the automatic stay, enough delay so that a debtor can make enough plan payments for Schaller to collect a fee, but not to legitimately reorganize the debtor's obligations.

In the Case at bar, in 2015, the Debtor was facing an upcoming sheriff sale of his home located at 3419 N. Kedzie Avenue, Chicago, IL 60618 (the "Kedzie Property"). The Debtor also owned another property located at 5944 W. 64th Street, Chicago IL 60638 (the "64th Street Property"). The Kedzie Property was scheduled to be sold via foreclosure sale on February 20, 2015 and, as a result, Schaller sent to the Debtor what appears to be one of his standard solicitation mailings. In response, the Debtor requested that the Schaller Firm file for chapter 13 bankruptcy relief on his behalf and, in so doing, became one of Schaller's Surrender Method clients.

The Schaller Firm filed the Debtor's first voluntary petition for relief under chapter 13 of the Bankruptcy Code on February 13, 2015 ("Tabor I").[4] Attorney Michael Oreluk ("Oreluk"), an associate with the Schaller Firm, signed the Tabor I petition and submitted the case using his Case Management/Electronic Case File ("CM/ECF") account. In Tabor I, however, neither Schaller nor Oreluk nor any other attorney from the Schaller Firm filed the required chapter 13 plan on the Debtor's behalf. As a result, the chapter 13 trustee moved for and received dismissal of the Tabor I case for failure to file a plan on June 03, 2015.[5] It does not appear that anyone from the Schaller Firm contested the dismissal.

In Tabor I, a court-approved retention agreement ("CARA"), *see* Local Form 23c, and application for compensation were filed with Oreluk's signature,[6] indicating that the Debtor paid $1,000.00 plus filing expenses in advance of the Schaller Firm filing the case. In the application, Oreluk sought compensation to be paid to the Schaller Firm, not to himself. *See* Attorney's Application for Compensation Representing Chapter 13 Debtor(s) [Tabor I, Dkt. No. 13] and proposed order thereto [Tabor I, Dkt. No. 13-3]. The Schaller Firm's overall request for compensation was in the amount of $4,000.00. Upon the dismissal of Tabor I, Judge Schmetterer

---

[4]      *In re Tabor*, Case No. 15bk05335 (Bankr. N.D. Ill. filed Feb. 18, 2015) (Schmetterer, J.).

[5]      In fact, the chapter 13 trustee filed three separate motions to dismiss in Tabor I, all of which were pending when that case was dismissed. In addition, the Debtor's meeting under section 341 of the Bankruptcy Code did not occur. Schaller's application for compensation was filed after the motions to dismiss were already on file and the meeting under section 341 had failed to occur.

[6]      An attorney is deemed to have affixed their signature to a document by indicating a signature by the designation /s/, followed by the typed name of the Attorney. Admin. Proc. for the Case Management/Electronic Case Filing System, at p. 8.

entered an order granting the Schaller Firm's application for compensation insofar as funds held by the chapter 13 trustee. As a result, the chapter 13 trustee disbursed another $2,432.70 of funds paid by the Debtor. The Schaller Firm therefore received $3,432.70 in total compensation for Tabor I.

Two months after the dismissal of Tabor I, the Schaller Firm again contacted the Debtor, sending him correspondence advising him that filing a bankruptcy case would stop any potential sheriff sale. While the Debtor was hesitant to file a second case, after the Debtor spoke to Schaller, he consented. On August 3, 2015, the Schaller Firm filed a second petition for relief under chapter 13 on behalf of the Debtor, commencing this Case ("Tabor II"). Oreluk signed the Tabor II petition and all documents associated with the Case on the Debtor's behalf and filed the Case using his CM/ECF account.

The schedules in Tabor II [Dkt. No. 11] (the "Schedules") were filed on August 17, 2015, reflecting $1,268,380.27 in secured claims and $80,218.39 in general unsecured claims. On that same date, the Debtor's chapter 13 plan [Dkt. No. 9] (the "Plan") was filed. The Plan provided that the Debtor would pay $600.00 per month for 60 months towards his debts. Out of that payment, the Schaller Firm's fees, one priority unsecured claim and the chapter 13 trustee's fees would be paid first, with the remainder going to the Debtor's general unsecured creditors. The Plan included no payments on account of the Kedzie Property or the 64th Street Property. Instead, the Plan included an express provision in the special terms section requesting that the chapter 13 trustee make no payments to JPMorgan Chase, the mortgage holder on the Kedzie Property. Plan, at ¶ G(2). It was silent as to the treatment of Sun West Mortgage Company, Inc., the reverse mortgage holder on the 64th Street Property.

The chapter 13 trustee subsequently filed a motion to dismiss Tabor II based on the Debtor's failure to begin Plan payments and ineligibility for chapter 13 relief under section 109(e) of the Bankruptcy Code. Motion to Dismiss for Unreasonable Delay [Dkt. No. 19]. The request for dismissal was not contested and was granted at the first hearing thereon on, September 23, 2015. Order Dismissing Case for Unreasonable Delay [Dkt. No. 20].[7]

In Tabor II, a CARA was again filed indicating that the Debtor paid $1,000.00 plus filing expenses in advance of the Schaller Firm filing the case. The Schaller Firm did not, however, file an application for compensation. Upon the dismissal of Tabor II, therefore, no further compensation was ordered. As a result, the Schaller Firm received $1,000.00 in total compensation for the Case, a case pending for 51 days, bringing Schaller's total received compensation for Tabor I and Tabor II to $4,432.70.

While the Case was thereafter closed, it was reopened by the U.S. Trustee to bring the Motion at bar.

The U.S. Trustee alleges in its Motion that the legal representation provided to the Debtor was deficient and that this deficiency was typical of the legal services offered by the Schaller Firm. More specifically, the U.S. Trustee alleges that Schaller counseled the Debtor to file for chapter 13 relief knowing that he did not qualify under the Bankruptcy Code. The U.S. Trustee also contends

---

[7]     The failure to contest the dismissal may have been the result of Schaller's receipt from the Debtor of a letter directing Schaller not to file the Case. U.S. Trustee Exh. No. 24. However, Oreluk and the Schaller Firm remained counsel to the Debtor, with all duties appurtenant thereto.

that the Schaller Firm filed inaccurate, prefabricated schedules in both of the Debtor's cases, a common practice of the Schaller Firm. Last, the U.S. Trustee asserts that the Plan proposed on behalf of the Debtor in this Case was flawed and certain to fail because of the Debtor's financial circumstances. All of this, the U.S. Trustee alleges, was done more to benefit Schaller financially than to genuinely assist the Debtor.

## RELIEF REQUESTED

The matter before the court is complex and has consumed much of the court's limited resources. Too often and with increasing frequency, the court must take its focus off of the substantive matters before it and turn instead to issues of attorney behavior. *See, e.g.*, *In re Gilliam*, Case No. 17bk18368, — B.R. —, 2018 WL 1582481, at *7 (Bankr. N.D. Ill. Mar. 28, 2018) (Barnes, J.) (ruling on over 50 cases wherein attorney behavior with respect to compensation was challenged).

Some of the complexity in this matter stems from the U.S. Trustee's management of its case against Schaller. Originally, the U.S. Trustee sought to have this court proceed against Schaller as a disciplinary matter under Rule 9029-4B (the "Bankruptcy Court Disciplinary Rules")[8] of the Local Rules for the United States Bankruptcy Court of the Northern District of Illinois. The request was insufficiently pled, however, and was returned to the U.S. Trustee to be corrected. Instead, the U.S. Trustee forwent the collective process and filed individual motions for sanctions in many of the cases in which Schaller was counsel.

Despite the fact that these motions are filed in individual cases, the U.S. Trustee appears to seek a finding in this Case with respect to Schaller's practices generally. The focus in this individual sanction proceeding is, however, on the facts of the Case at bar. This leaves the court to bring the focus back to the facts of this Case, looking to general practices when such practices help understand behavior in this Case.

Another complication—and not a small one—is that neither the U.S. Trustee nor Schaller called the Debtor as a witness in the Trial (defined *infra*). At the Trial, it was explained that the Debtor was elderly and ill and thus coming to the Trial would have been too stressful. Tr. at p. 12, Nov. 6, 2017. However, no attempt was made to admit the Debtor's testimony in his absence. *See, e.g.*, Fed. R. Evid. 804. Thus, many questions regarding the Debtor's complicity in the conduct at bar went unanswered.

Further complicating the presentation of issues is the manner in which the U.S. Trustee has sought relief in this Case. For example, in the Motion, the U.S. Trustee did not enumerate "claims" *per se*. That nomenclature was not put into use until the U.S. Trustee's Pretrial Statement. The United States Trustee's Pretrial Statement [Dkt. No. 76] (the "U.S. Trustee's Pretrial Statement"), however, sets forth six claims (the "Claims"). These Claims are as follows:

> Claim 1:   "Robert Schaller caused Elton Tabor to be counseled to file Chapter 13, as opposed to Chapter 7, for the primary purpose of furthering Robert Schaller's pecuniary interests. Facing foreclosure of his home in February 2015, and again

---

[8]   Under the authority of the District Court, the Bankruptcy Court Disciplinary Rules provide that the bankruptcy court may take up allegations of misconduct, in other words, acts or omissions by an attorney that violates the disciplinary rules of the District Court. Bankr. N.D. Ill. R. 9029-4B(A)(1)(a).

in July 2015, Mr. Tabor responded to one of Robert Schaller's letters by turning
to the Schaller Law Firm for help. Although Mr. Tabor lacked the financial
resources to save his home through Chapter 13 bankruptcy, and although he was
not even eligible to be a Chapter 13 debtor due to the debt limits, Robert
Schaller filed two Chapter 13 petitions on his behalf." U.S. Trustee's Pretrial
Stmt., at p. 1.

Claim 2:    "Robert Schaller advertised to financially desperate and vulnerable potential
clients that he knew to be on the precipice of losing their homes, including Elton
Tabor, and made misleading and illusory claims in such advertisements, including
the premise of a 'DEADLINE TO SAVE YOUR HOME.' In fact, when
Robert Schaller sent such advertisements to Mr. Tabor and others, he had no
intention of 'saving' their homes. Robert Schaller's intention was to propose and
confirm a Chapter 13 plan that either did not address the mortgage obligations,
or provided for the surrender of the home. This is what is known as Schaller's
'Surrender Method' Chapter 13 case. The practical purpose of the Surrender
Method is to achieve enough delay with the automatic stay so that sufficient
payments can be made for the Trustee to disburse to Robert Schaller for an
attorney fee. The theoretical idea is that the client will negotiate, *pro se*, a
modification of their home loan. Although Robert Schaller almost always uses
the Court-Approved Retention Agreement in Surrender Method cases, and
although he is fully aware that Paragraph 16 has been interpreted to include
negotiations with secured lenders, he often causes Surrender Method clients to
execute side agreements absolving him of any responsibility concerning the
mortgage modification component of the approach he counsels. In other words,
Schaller markets to prospective clients facing a challenge with a particular debt
(their home mortgage); prospective clients seek Schaller's assistance in dealing
with that challenge, and Schaller sells a substantial number of prospective clients
a Chapter 13 bankruptcy case that proposes to resolve all debts *except the one that
led them to him in the first place*." *Id.* at pp. 1-2 (footnote omitted).

Claim 3:    "The Chapter 13 plan prepared and filed for Elton Tabor in Case No. 16-26544
was filed in bad faith. It had no chance for success, and Robert Schaller knew, or
should have known this. The plan was premised on deriving income from real
properties, without addressing the mortgage payments and taxes for those
properties." *Id.* at p. 3.

Claim 4:    "To reduce the amount of time spent on each bankruptcy file, Robert Schaller
created a set of prefabricated answers for certain fields on Schedule B, and
caused his clients, including Elton Tabor, to execute these documents under
penalty of perjury. This resulted in inaccurate schedules being filed with the
Court. Robert Schaller attempts to insulate himself from responsibility for the
foreseeable inaccuracies by relying on debtors' execution of the schedules under
penalty of perjury, and the debtors' testimony at the creditors' meeting affirming
the accuracy of the schedules." *Id.*

Claim 5:    "At times relevant, Robert Schaller created a law firm culture that ascribed
insufficient priority to (i) the accuracy of sworn schedules filed by Robert

6

Schaller's clients, as evidenced by the various inaccuracies in the schedules of
Elton Tabor, and (ii) the manner in which the schedules were presented to Tabor
for review, which was inconsistent with the obligations set forth in the Court-
Approved Retention Agreement executed in both of Tabor's bankruptcy cases."
*Id.*

Claim 6:   "Robert Schaller has refused to acknowledge the deficiency of his practices and
conduct, which, as manifested in the cases of Elton Tabor, can be characterized
as predatory and dishonest. Instead of taking responsibility, Robert Schaller has
attempted to hide behind his associate attorneys, even claiming to not know
whether he filed Mr. Tabor's second bankruptcy case. Robert Schaller also tried
to intimidate his way out of consequences for his actions by threatening the U.S.
Trustee and his attorney with sanctions. Serious sanctions are necessary to
dissuade Robert Schaller, and other similarly situated attorneys, from engaging in
the type of predatory and dishonest conduct manifested in Mr. Tabor's
bankruptcy cases." *Id.* at p. 4.

The enumeration of the Claims is useful, though the court agrees with Schaller that the U.S.
Trustee in providing this list has expanded the scope of the Motion. In particular, Claim 6 does not
appear to exist in any form in the Motion. The court will take up the propriety of that and any other
troubling additions, below.

The U.S. Trustee seeks in respect of the Claims what are essentially four forms of relief:

(A) Requiring Robert V. Schaller to refund all fees collected from, or on behalf of,
Elton Tabor, for legal services rendered in *Tabor I* and *Tabor II*; (B) Censuring Robert
V. Schaller for his conduct in *Tabor I* and *Tabor II*; (C) Requiring Robert V. Schaller
to pay a fee of not less than $5,000 to the Clerk of Court to dissuade Schaller, and
similarly situated attorneys, from engaging in the type of misconduct exhibited in
*Tabor I* and *Tabor II*; [and] (D) Requiring Robert V. Schaller to reimburse the United
States Trustee for his attorney fees and costs relating to this Motion … .

Mtn., at p. 13. Again, the court will consider the propriety of these requests below.

PROCEDURAL HISTORY

This matter has given rise to an extraordinary number of hearings and filings. In addition to
reviewing the Motion, the court has considered the arguments of the parties at the trial that took
place in this court on November 6, 7, 8, 27 and 29, 2017 (the "Trial"). At the conclusion of the
Trial, the court ordered written closing briefs in *lieu* of closing statements. Those have been
submitted, and the matter is fully briefed. This Memorandum Decision constitutes the court's
determination of all matters under advisement, unless expressly stated herein otherwise.

In considering the relief sought by the U.S. Trustee, this court has considered the evidence
and arguments presented by the parties, reviewed the Motion and, except as noted below, has
admitted the U.S. Trustee's Exhibits 1-48 and Schaller's Exhibits 1-89 into evidence. This court has
also reviewed and found each of the following of particular relevance:

7

(1)    Robert V. Schaller's Objection to the U.S. Trustee's Motion for Sanctions and Other Relief [Dkt. No. 29-1];

(2)    Reply to Robert V. Schaller's Objection [Dkt. No. 39];

(3)    Final Pretrial Order Governing United State[s] Trustee's Motion for Sanctions [Dkt. No. 73] (the "Final Pretrial Order");

(4)    The U.S. Trustee's Pretrial Statement;

(5)    Robert V. Schaller's Pre-trial Statement [Dkt. No. 77] ("Schaller's Pretrial Statement");

(6)    Motion *in Limine* to Exclude Respondent's Exhibits 51, 52 and 73 [Dkt. No. 80];

(7)    Objection to Respondent's Pretrial Statement [Dkt. No. 81];

(8)    Robert V. Schaller's Motion *in Limine* to Bar Evidence of His "Refusal to Recognize" His Bad Practices and Conduct [Dkt. No. 82] ("Motion *in Limine* I");

(9)    Robert V. Schaller's Motion *in Limine* to Bar Evidence Regarding Claims 2, 4, and 5 Under the Doctrine of Collateral Estoppel and Court Imposed Limitation of Issues [Dkt. No. 83] ("Motion *in Limine* II");

(10)   Robert V. Schaller's Motion *in Limine* to Bar Testimony of Eli Randall and Mark Goddard and Exhibits 47 and 48 [Dkt. No. 84] ("Motion *in Limine* III");

(11)   Robert V. Schaller's Motion *in Limine* to Bar Testimony of Zuzanna Jedynak and Oksana Prus and Exhibit 44 [Dkt. No. 85] ("Motion *in Limine* IV");

(12)   Robert V. Schaller's Objections to the U.S. Trustee's Pre-trial Statement [Dkt. No. 87];

(13)   Omnibus Response to Robert V. Schaller's Motions *In Limine* and Objection to the U.S. Trustee's Pretrial Statement [Dkt. No. 88];

(14)   Transcript of Trial re: Motion for Sanctions [26] Before the Honorable Timothy A. Barnes United States Bankruptcy Court Judge, November 6, 2017 [Dkt. No. 101];

(15)   Transcript of Trial re: Motion for Sanctions [26] Before the Honorable Timothy A. Barnes United States Bankruptcy Court Judge, November 7, 2017 [Dkt. No. 102];

(16)   Transcript of Trial re: Motion for Sanctions [26] Before the Honorable Timothy A. Barnes United States Bankruptcy Court Judge, November 8, 2017 [Dkt. No. 103];

(17)   Transcript of Trial re: Motion for Sanctions [26] Before the Honorable Timothy A. Barnes United States Bankruptcy Court Judge, November 27, 2017 [Dkt. No. 108];

(18)    Transcript of Trial re: Motion for Sanctions [26] Before the Honorable Timothy A. Barnes United States Bankruptcy Court Judge, November 29, 2017 [Dkt. No. 109];

(19)    Brief in *Lieu* of Closing Argument [Dkt. No. 112] ("the U.S. Trustee's Closing Argument"); and

(20)    Robert V. Schaller's Written Closing Argument [Dkt. No. 113] ("Schaller's Closing Argument").

The court has also taken into consideration all exhibits submitted in conjunction with the foregoing. Though these items do not constitute an exhaustive list of the filings in the Case, the court has taken judicial notice of the contents of the docket in this Case. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same). The court has also taken judicial notice of the contents of the docket in Tabor I.

EVIDENTIARY RULINGS

Pursuant to the Final Pretrial Order, "any objection to an exhibit (other than weight/relevance) which is *not* raised [in the party's pretrial statement] will be waived." Final Pretrial Order, at p. 1. As a result, prior to the Trial, both Schaller and the U.S. Trustee filed motions *in limine* seeking to exclude certain evidence presented by the opposing party.

A.    Schaller's Motions *in Limine*

Schaller filed four motions *in limine*. Schaller argued in Motion *in Limine* I that the motion for sanctions that he previously tendered to the U.S. Trustee but did not file with the court should be barred because it lacks relevance. Schaller's evidentiary objection, in the context of Motion *in Limine* I, was at its basis a challenge to the relevance of the evidence to the questions before the court. Federal Rule of Evidence 403 affords the court the authority to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"In the bankruptcy court, the bankruptcy judge is the fact-finder." *In re Kenneth Leventhal & Co.*, 19 F.3d 1174, 1178 (7th Cir. 1994). In that role, the court is more than capable of determining the weight of any judicially noticed fact, *In re Hood*, 449 F. App'x 507, 510 (7th Cir. 2011) ("the bankruptcy court was entitled as the trier of fact to decide how to weigh the evidence before it"), and in that role Judge Posner has instructed that the court in a bench trial may "admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003), *aff'd*, 365 F.3d 1306 (Fed. Cir. 2004), *opinion vacated on reh'g en banc and aff'd on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005). As such, the court declined at the outset of the Trial to exclude the unfiled motion for sanctions, but instead, as with all exhibits, reserved its ruling on the questions of relevance and weight pending the presentation at the Trial. Now, given the court's understanding of the underlying substantive issues and the evidence presented at the Trial, the court finds Schaller's motion for sanctions of little or no probative value and declines to consider it in rendering a decision.

9

Motion *in Limine* I also sought to bar evidence of Claim 6 as asserted in the U.S. Trustee's Pretrial Statement. Claim 6 states, in pertinent part, that Schaller has refused to acknowledge deficiencies in his practice and conduct which could be categorized as predatory and dishonest. Claim 6 was not included in the relief sought in the original Motion, appearing instead for the first time in the U.S. Trustee's Pretrial Statement. Because this Claim was not included in the Motion, Schaller argues that he would be prejudiced by having to defend against it after the close of discovery.

The proper procedure for asserting new claims after the close of discovery is to file a motion requesting leave to amend the operative pleading. Fed. R. Civ. P. 15; *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004). The risk of prejudice in doing otherwise is too great. While this Claim might have relevance, to have it considered the U.S. Trustee must have presented it in its original Motion or, at the very least, in time for Schaller to have had an opportunity to respond. The court therefore granted Schaller's request to bar Claim 6 and instructed the U.S. Trustee that it would decline to rule on Claim 6. The court will only enter relief as requested in the Motion and, as previously held, will weigh the relevance of evidence if presented for a proper purpose.

Schaller's Motion *in Limine* II sought to bar evidence regarding Claims 2, 4 and 5 in the U.S. Trustee's Pretrial Statement. Schaller asserted that the doctrine of collateral estoppel barred these Claims. Specifically, Schaller alleged that when the bankruptcy judges in this court declined to initiate a collective disciplinary action against him for allegations under the Bankruptcy Court Disciplinary Rules, that decision was an adjudication on the merits of the Motion in this Case.

The court determined that this argument lacked merit as Schaller did not establish the collateral estoppel elements. Collateral estoppel has the following required elements: "1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987).

Collateral estoppel is inapplicable because none of these elements is satisfied. Most importantly, there was no final judgment on the merits in a former suit; in fact, there was no judgment at all. As noted earlier, the U.S. Trustee's complaint of misconduct was deemed insufficiently pled and the matter was returned to the U.S. Trustee to be corrected. While that did not happen, the opportunity to correct the complaint remains. For these reasons, Schaller's request to apply collateral estoppel was denied.

Through Motions *in Limine* II, III and IV Schaller sought to bar evidence from cases that he has filed for other debtors. Schaller argued that Judge Hollis's prior rulings in this Case held that the evidence mentioned was not proper and limited the scope of the Trial to the allegations of this Case. As Judge Hollis determined, it is the Motion that dictates the issues and scope of the Trial. Any Claims not relevant to the facts of Tabor I or Tabor II are outside the scope of consideration.[9]

---

[9]     As discussed in more detail below, the scope of a section 105 action may in fact be broad enough to capture multiple, unrelated cases under the Bankruptcy Code. The earlier decisions in this matter limited the scope to Tabor I and Tabor II alone, however, and it is much too late in the day to change that now.

In Motion *in Limine* II, Schaller argued that this limitation should bar Claims 2 and 4 as asserted in the U.S. Trustee's Pretrial Statement.[10] Those Claims, however, arise from the facts of this Case. Thus, the court allowed Claims 2 and 4 to proceed.

Motion *in Limine* III, however, presents a different argument. There Schaller alleged that the U.S. Trustee failed to disclose proposed testimony from Mark Goddard ("Goddard") and Eli Randall ("Randall"), both former clients of Schaller, to Schaller's counsel during discovery and thus was barred from presenting them as witnesses at the Trial under Federal Rule of Civil Procedure 37, which states that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), or the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The U.S. Trustee acknowledged the nondisclosure and agreed to forego calling Goddard and Randall. Therefore, the request in Motion *in Limine* III to bar the testimony of Goddard and Randall was rendered moot.

In Motion *in Limine* III, Schaller also argued that the schedules in the bankruptcy cases of Goddard and Randall, U.S. Trustee Exh. Nos. 47 and 48, should not be admitted. In response, the U.S. Trustee argued that these had been produced in response to Schaller's March 14, 2017 document request. The U.S. Trustee asserts that, because they produced the documents, there would be no prejudice. The court agrees, but as Schaller's objection was also a relevance objection, stated that it would determine the relevance of the documents if and when presented. The court denied Schaller's request to bar the schedules in the Goddard and Randall cases.

Motion *in Limine* IV sought to bar the testimony of Zuzanna Jedynak ("Jedynak") and Oksana Prus ("Prus").[11] Schaller argued that the Trustee failed to disclose their testimony during discovery and that the testimony is thus prejudicial. Despite admitting a failure to disclose the testimony in question, the U.S. Trustee argued that the testimony was not prejudicial because it only spoke to the contentiousness of a meeting that Schaller had with Jedynak and Prus as the catalyst for Schaller changing his practice of filing bankruptcy cases under the CM/ECF accounts of his associates instead of his own. The U.S. Trustee further argued that the failure to disclose these witnesses was because the witnesses were unknown until Schaller provided all discovery, which was after the disclosure deadline for witnesses. The U.S. Trustee also argued that Schaller would not be prejudiced as his counsel deposed Jedynak for four hours and had a deposition with Prus scheduled to occur before the Trial. Schaller argued in response that the deposition of Jedynak was for matters briefed in the Jedynak case and Schaller did not use the deposition of Jedynak to prepare for this Trial.

---

[10]    Schaller also sought to exclude Claim 6 on this basis. As the court has ruled that Claim 6 is not proper, any determination of the propriety of Claim 6 with respect to this argument is moot.

[11]    Jedynak is a former client of Schaller and Prus is her friend. A separate Motion for Sanctions against Schaller has been filed by the U.S. Trustee in Jedynak's bankruptcy case. *In re Jedynak*, Case No. 13bk02306 (Bankr. N.D. Ill. filed Jan. 22, 2013) (Barnes, J.).

The court was not convinced that Schaller had a proper opportunity to cross-examine Jedynak and Prus with respect to preparation for this Case and is empowered to exclude evidence in such circumstances. The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. The presentation of the testimony of Jedynak and Prus in this Case and the prejudice that it may have in the Jedynak case outweigh the relevance that could be obtained from testimony with respect to the allegations in this Case. For these reasons, the court granted Schaller's request to bar the testimony of Jedynak and Prus.

Last, in Motion *in Limine* IV, Schaller requested that the schedules in the Jedynak case be barred. For the reasons stated by the court in ruling on Schaller's previous request to bar the schedules of Goddard and Randall, the request was denied.

B.     The U.S. Trustee's Motion in *Limine*

The U.S. Trustee filed one motion in *limine* in which he sought rulings on the admissibility of three exhibits based on two theories of law. The court ruled on each by addressing each theory of law in turn.

The U.S. Trustee objected to the admission of Schaller Exh. Nos. 51 and 52 for the truth of the matters asserted therein—valuation of property—under Federal Rule of Evidence 802 because Zillow printouts constitute hearsay and do not satisfy any exception. Under Federal Rule of Evidence 802, "[h]earsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802. Schaller argued that he is not using Zillow printouts to establish the value of the properties in the Debtor's Case, but rather to show the process used when preparing the Debtor's Schedules. Thus, he argued, the printouts are excepted from hearsay under Federal Rule of Evidence 803(3) as a then-existing mental, emotional or physical condition. In the alternative, Schaller argued that the Zillow printouts may be admitted for the truth of the valuation of the Debtor's properties as the Debtor could use them as the owner of the properties in testifying as to their value.

The undersigned routinely prohibits reliance on Zillow in matters of evidentiary value. "Zillow is a participatory cite [sic] almost like Wikipedia. In the same manner that Wikipedia allows anyone to input or change entries, Zillow allows homeowners to do so. A homeowner with no technical skill beyond the ability to surf the web can log in to Zillow and add or subtract data that will change the value of his property. This of course makes Zillow inherently unreliable." *In re Darosa*, 442 B.R. 173, 177 (Bankr. D. Mass. 2010). Zillow is therefore not a statement that has equivalent circumstantial guarantees of trustworthiness. Numerous courts dispute the trustworthiness of Zillow, including this court as stated in prior rulings. The court therefore ruled that the Zillow exhibits, Schaller Exh. Nos. 51 and 52, were not admissible for valuation purposes but did not produce their use otherwise.

The U.S. Trustee objected to the admission of Schaller Exh. No. 73—"Video Regarding Bankruptcy"—under Federal Rule of Evidence 901 because Schaller failed to provide any evidence to demonstrate that the video is what Schaller claims it to be. To the extent that Schaller could produce such evidence—*i.e.* that the video was tendered to the Debtor—the U.S. Trustee did not object to Schaller Exh. No. 73 being used for a relevant purpose. In response, Schaller admitted a

failure to timely disclose the video in a transferrable file but alleged that he sent a YouTube hyperlink satisfying his disclosure requirements.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. "Although authentication may be achieved in many ways, Federal Rule of Evidence 901(b) provides some examples of authentication, one of which is the testimony of a 'witness with knowledge' 'that a matter is what it is claim to be.'" *Snyder v. Tiller*, Case No. 3:08-CV-00470, 2010 WL 3522580, at *6 (N.D. Ind. Aug. 30, 2010). Using these guidelines, the court declined to admit Schaller Exh. No. 73 in advance, but reserved for later ruling overall admissibility until such time that Schaller could adequately authenticate transmittal and reception of the video to the Debtor. Whether the Debtor received the video was never adduced at the Trial, perhaps because the Debtor did not testify. Schaller's counsel did not refer to Schaller Exh. No. 73 at the Trial or Schaller's Closing Argument. Given the court's understanding of the issues, the court finds now that Schaller Exh. No. 73 offers little probative value and declines to consider it in rendering its decision.

C.    Objection to Pretrial Statements

The U.S. Trustee also filed an objection to Schaller's Pretrial Statement. In the objection, the U.S. Trustee stipulated to many of Schaller's proposed facts and disputed a number of facts that Schaller had presented as proposed stipulated facts.[12] The U.S. Trustee's objections to the proposed stipulated facts made the court aware that there was a dispute over these facts and alerted Schaller that the same were not stipulated to for purposes of litigation at the Trial.

Schaller also filed an objection to the U.S. Trustee's Pretrial Statement. In his objection, Schaller stipulated to certain of the U.S. Trustee's proposed facts.[13] Schaller also repeated many of the arguments made in the four motions *in limine* already on file with the court.

As best as the court can determine, Schaller raised only one new issue, an objection to the admissibility of the U.S. Trustee Exh. No. 45—Transcript of Schaller Deposition. The court ruled that the deposition may be used however, the court would weigh relevance depending upon use of the transcript at the Trial. The deposition testimony was utilized at the Trial. Tr. at pp. 36-38, Nov. 7, 2017. Schaller's counsel raised three objections to its use, but each objection was overruled. *Id.*

As the result of the use at the Trial, the court considers Schaller Exh. No. 45 to be admitted and has considered it in rendering its decision.

---

[12]    The U.S. Trustee stipulated to Schaller's proposed fact nos.: 1, 2, 9, 10, 12, 22, 25, 27, 28, 31, 40, 50, 53, 54, 55, 57 and 58. Dkt. No. 81.

[13]    Schaller stipulated to the U.S. Trustee's proposed fact nos.: 1, 2, 3, 16, 18, 20, 21, 22, 23, 24, 25, 28, 30, 41, 42 and 57. Dkt. No. 87.

FINDINGS OF FACT

From the review and consideration of the procedural background, as well as the evidence presented at the Trial, the court determines the salient facts to be and so finds as follows:[14]

a)    Schaller is the founder, president and sole owner of the Schaller Firm.  U.S. Trustee's Pretrial Stmt., at ¶ 2.

b)    By his own account, Schaller has practiced law for more than twenty-nine years and has filed more than 2,700 bankruptcy cases.  U.S. Trustee's Pretrial Stmt., at ¶ 3; Tr. at p. 32, Nov. 6, 2017.

c)    Schaller possesses and exercises management control over the Schaller Firm.  U.S. Trustee's Pretrial Stmt., at ¶ 4; Tr. at p. 40, Nov. 6, 2017.

d)    Oreluk is an attorney who was employed as an associate by Schaller at the Schaller Firm in 2015.  U.S. Trustee's Pretrial Stmt., at ¶ 5; Tr. at p. 40, Nov. 6, 2017.

e)    Courtney Morso ("Morso") is an attorney who was employed as an associate by Schaller at the Schaller Firm in 2015.  U.S. Trustee's Pretrial Stmt., at ¶ 6; Tr. at pp. 40-41, Nov. 6, 2017.

f)    Austin Pollak ("Pollak") is an attorney who was employed as an associate by Schaller at the Schaller Firm in 2015.  U.S. Trustee's Pretrial Stmt., at ¶ 7; Tr. at p. 41, Nov. 6, 2017.

g)    Phoebe Amberg ("Amberg") is an attorney who was employed as an associate by Schaller at the Schaller Firm in 2015.  U.S. Trustee's Pretrial Stmt., at ¶ 8; Tr. at p. 41, Nov. 6, 2017.

h)    Michael S. Fabinski ("Fabinski") is an attorney who was employed as an associate by Schaller at the Schaller Law Firm beginning on July 31, 2014 and continuing through April of 2015.  U.S. Trustee's Pretrial Stmt., at ¶ 9; Tr. at p. 41, Nov. 6, 2017.

i)    Between August 2014 and April 2015, all cases filed by the Schaller Law Firm were filed through Oreluk's CM/ECF account.  Tr. at pp. 43-47, Nov. 6, 2016.

j)    During 2015, Schaller actively marketed to potential clients whose homes were facing foreclosure.  U.S. Trustee's Pretrial Stmt., at ¶ 15; Tr. at p. 71, Nov. 6, 2017; see U.S. Trustee Exh. Nos. 19, 20 and 22.

k)    Schaller sent a mailing to the Debtor dated June 11, 2015 with the subject line "2/20/2015 DEADLINE TO SAVE YOUR HOME!"  The mailing further states that the Debtor should expect to "[f]eel instant relief and peace of mind during this difficult time in [his] life."  U.S. Trustee Exh. No. 22.  Schaller promised in the mailing that if he failed to stop the Debtor's upcoming sheriff sale he would provide

---

[14]    To the extent any facts below are evidenced by either the U.S. Trustee's Pretrial Statement or Schaller's Pretrial Statement, that fact has been stipulated to as noted above.

the Debtor with a 100% money-back refund. *Id.* Lastly, the solicitation had a five-hundred-dollar coupon, offering Tabor a discount off the retainer if he opted to meet Schaller at the firm's Oak Brook, IL office. *Id.*

l)     The Debtor contacted the Schaller Law Firm in February 2015 after receiving a letter in the mail. Schaller's Pretrial Stmt., at ¶ 1; U.S. Trustee's Pretrial Stmt., at ¶ 16; Tr. at p. 70, Nov. 6, 2017; *see* U.S. Trustee Exh. No. 9, at p. 1.

m)    The Debtor visited the Schaller Firm's office in Oak Brook, IL where he met with Fabinski on February 17, 2015. U.S. Trustee's Pretrial Stmt., at ¶ 17; Tr. at p. 77, Nov. 6, 2017; *see* U.S. Trustee Exh. No. 9, at p. 1.

n)    The Debtor executed documents to authorize a bankruptcy filing during the February 17, 2015 meeting. Schaller's Pretrial Stmt., at ¶ 8; U.S. Trustee's Pretrial Stmt., at ¶ 18; *see* U.S. Trustee Exh. No. 25, at p. 4.

o)    During the February 17, 2015 meeting, the Debtor signed the Evaluation of Chapter 13 Bankruptcy Options form drafted by the Schaller Firm. Schaller's Pretrial Stmt., at ¶ 8; U.S. Trustee's Pretrial Stmt., at ¶ 19; Tr. at p. 78, Nov. 6, 2017; Schaller Exh. No. 61; *see* U.S. Trustee Exh. No. 10.

p)    The Evaluation of Chapter 13 Bankruptcy Options, signed by the Debtor, describes two options and certain considerations related to each. "Option 1" was to repay the Debtor's mortgage arrears in full and continue to make monthly mortgage payments. "Option 2" was to attempt to modify the mortgage. Schaller's Pretrial Stmt., at ¶ 5; U.S. Trustee's Pretrial Stmt., at ¶ 20; Schaller Exh. No. 61; *see* U.S. Trustee Exh. No. 10.

q)    The Loan Modification and Automatic Stay Lift disclosure, which the Debtor signed, explains that if the Debtor is unable to receive a *pro se* loan modification by the time of hearing on confirmation of the Debtor's chapter 13 plan, the Debtor authorized the Schaller Law Firm to file a modified chapter 13 plan that provides for surrender of the Debtor's Kedzie and 64th Street Properties. The document also authorized the Schaller Law Firm to agree to entry of an order lifting the automatic stay. Schaller's Pretrial Stmt., at ¶ 8; U.S. Trustee's Pretrial Stmt., at ¶ 21; Schaller Exh. No. 61; *see* U.S. Trustee Exh. No. 10.

r)    Also during the February 17, 2015 meeting, per protocol established by Schaller, the Debtor was recorded by audio device consenting to the treatment of his home in the contemplated chapter 13 plan. Schaller's Pretrial Stmt., at ¶ 8; U.S. Trustee's Pretrial Stmt., at ¶ 22; Tr. at p. 195, Nov. 6, 2017; Schaller Exh. No. 58; *see* U.S. Trustee Exh. No. 35(a).

s)    On February 18, 2015, Schaller, using Oreluk's CM/ECF account, filed the Debtor's first bankruptcy petition for relief under chapter 13. Schaller's Pretrial Stmt., at ¶ 12; Schaller Exh. No. 36(a); U.S. Trustee's Pretrial Stmt., at ¶¶ 24, 26; Tr. at p. 80, Nov. 6, 2017; *see* U.S. Trustee Exh. No. 25, at p. 4.

t)    The Tabor I petition bears the "/s/" signature of Oreluk. Appended to the Tabor I petition is the required statement under Bankruptcy Rule, reporting that the Debtor paid the Schaller Firm $1,000.00 in compensation prior to filing, with a balance of $3,000.00 to be paid through the chapter 13 plan. This statement also bears the signature of Oreluk above a signature block reciting Oreluk's position as an associate with the Schaller Law Firm and attached to the statement is a CARA signed by the Debtor with Oreluk's signature. U.S. Trustee's Pretrial Stmt., at ¶ 25.

u)    The CARA required that the attorney would:

> Personally review with the debtor and sign the completed petition, plan, statements, and schedules, as well as all amendments thereto, whether filed with the petition or later. (The schedules may be initially prepared with the help of clerical or paralegal staff of the attorney's office, but personal attention of the attorney is required for the review and signing.)

U.S. Trustee's Pretrial Stmt., at ¶ 28; Schaller Exh. No. 16, at pp. 9-12; U.S. Trustee Exh. No 2(a), at pp. 9-12.

v)    On March 6, 2015, Morso sent an email to the Debtor. In the email, Morso transmitted drafts of schedules, a Statement of Financial Affairs and a chapter 13 plan, among other documents. U.S. Trustee's Pretrial Stmt., at ¶ 29; Tr. at p. 82, Nov. 6, 2017; Schaller Exh. No. 45; *see* U.S. Trustee Exh. Nos. 6(a) and 6(b).

w)    The required schedules and chapter 13 plan were not filed in Tabor I and on June 3, 2015, the case was dismissed on the chapter 13 trustee's motion. Schaller's Pretrial Stmt., at ¶ 25; U.S. Trustee's Pretrial Stmt., at ¶ 30; Tr. at p. 84, Nov. 6, 2017.

x)    Contemporaneous with entry of the order dismissing Tabor I, on June 3, 2015, the court entered an order granting the Schaller Firm's application for compensation in that case. Schaller's Pretrial Stmt., at ¶ 27. The chapter 13 trustee disbursed $2,432.70 of funds paid by the Debtor to the chapter 13 trustee during the pendency of Tabor I to the Schaller Firm. In totality, the Schaller Firm received $3,432.70 for compensation in Tabor I. U.S. Trustee's Pretrial Stmt., at ¶ 31; Tr. at p. 84, Nov. 6, 2017; *see* U.S. Trustee Exh. No. 18.

y)    Again, after receiving correspondence from the Schaller Firm promising to save his home, the Debtor visited the Schaller Firm on July 31, 2015, and met with Pollak. Schaller's Pretrial Stmt., at ¶ 30; U.S. Trustee's Pretrial Stmt., at ¶ 32; Tr. at p. 85, Nov. 6, 2017; *see* U.S. Trustee Exh. No. 20, at p. 1.

z)    The Debtor signed documents authorizing the filing of a second bankruptcy case in addition to again signing Schaller's Evaluation of Chapter 13 Bankruptcy Options and Loan Modification and Automatic Stay Lift disclosures. Schaller's Pretrial Stmt., at ¶ 34; U.S. Trustee's Pretrial Stmt., at ¶ 33; Tr. at p. 88, Nov. 6, 2017; *see* U.S. Trustee Exh. No. 11.

aa)     On August 3, 2015, Schaller filed a second voluntary petition for bankruptcy relief
        under chapter 13 for the Debtor initiating the instant Case. Schaller's Pretrial Stmt.,
        at ¶ 40; U.S. Trustee's Pretrial Stmt., at ¶ 36; Tr. at p. 90, Nov. 6, 2017; Schaller Exh.
        No. 16; *see* U.S. Trustee Exh. No. 2(a).

bb)     The Tabor II petition bears the "/s/" signature of Oreluk. The Tabor II petition,
        and all of the other documents filed on behalf of the Debtor in Tabor II, were filed
        using Oreluk's CM/ECF account. Appended to the Tabor II petition is a statement
        identical to that in Tabor I with respect to the disclosure of compensation received
        by the Schaller Firm; it also bears the "/s/" signature of Oreluk above a signature
        block reciting Oreluk's position as an associate with the Schaller Firm. Another
        CARA signed by the Debtor and Oreluk is attached to the compensation statement.
        U.S. Trustee's Pretrial Stmt., at ¶ 37; Schaller Exh. No. 16, at p. 2; *see* U.S. Trustee
        Exh. No. 2(a), at p. 2.

cc)     After the Tabor II petition was filed, Schaller sent an email to Pierce & Associates,
        counsel for the secured lender with a mortgage on the Debtor's home, the Kedzie
        Property, to inform the firm of the bankruptcy filing. U.S. Trustee's Pretrial Stmt., at
        ¶ 38; Tr. at pp. 112-13, Nov. 6, 2017.

dd)     Schaller has represented, under oath, that he is not sure whether it was he who filed
        the Tabor II petition. U.S. Trustee's Pretrial Stmt., at ¶ 39; *see* U.S. Trustee Exh. No.
        13, at ¶ 12; *see also* U.S. Trustee Exh. No. 45, at p. 130.

ee)     On August 5, 2015, Amberg sent the Debtor an email with the subject: "Re: 15-
        26544 Elton Tabor Draft Documents." This email contained drafts of the schedules
        and Statement of Financial Affairs among other documents, and was a modified
        version of the same email sent to the Debtor on March 6, 2015, in Tabor I. U.S.
        Trustee's Pretrial Stmt., at ¶ 40; Tr. at pp. 142-43, Nov. 6, 2017; Schaller Exh. No.
        45; *see* U.S. Trustee Exh. No. 5(a).

ff)     On August 17, 2015, the Debtor's Schedules were filed in Tabor II. Schaller's
        Pretrial Stmt., at ¶ 53; U.S. Trustee's Pretrial Stmt., at ¶ 41.

gg)     According to the Tabor II petition, the Kedzie Property was the Debtor's residence.
        U.S. Trustee's Pretrial Stmt., at ¶ 44; Schaller Exh. No. 16; *see* U.S. Trustee Exh. No.
        2(a).

hh)     Schaller often used a standardized or prefabricated Schedule B throughout 2015.
        This schedule contained standardized descriptions and valuations for lines 1, 4, 5, 6,
        7, 8, 9 and 35. U.S. Trustee's Pretrial Stmt., at ¶ 47; Schaller Exh. No. 2(b), at p. 2;
        U.S. Trustee Exh. No. 2(b), at p. 2.

ii)     The Debtor's Schedule B reflects the standardized form used by Schaller. The
        Debtor's Schedule B contained the boilerplate representations for lines 1, 4, 5, 6, 7,
        8, 9 and 35, and provided unique information in response to lines 2, 12, 21 and 25.
        U.S. Trustee's Pretrial Stmt., at ¶ 48; Schaller Exh. No. 2(b), at p. 2; U.S. Trustee
        Exh. No. 2(b), at p. 2.

jj)  As of August 1, 2015, the monthly mortgage payment for the Kedzie Property was $5,537.50 and the payment arrearage due was $319,452.82.  U.S. Trustee's Pretrial Stmt., at ¶ 56; Schaller Exh. No. 57; *see* U.S. Trustee Exh. No. 28(a).

kk)  On August 26, 2015, Judge Hollis granted the Debtor's motion to extend the automatic stay pursuant to section 362(c)(3)(B) of the Bankruptcy Code.  Schaller's Pretrial Stmt., at ¶ 54; Schaller Exh. No. 28.

ll)  On August 30, 2015, the Debtor advised the Schaller Firm in writing that he no longer wished to continue with his second Chapter 13 case.  Schaller's Pretrial Stmt., at ¶ 57; Schaller Exh. No. 71.

mm)  On September 1, 2015, the Schaller Firm sent the Debtor a letter that confirmed the Debtor's desire to voluntarily dismiss this Case and advised the Debtor of the consequences of dismissing his second case.  Schaller's Pretrial Stmt., at ¶ 58; Schaller Exh. No. 72.

nn)  On September 8, 2015, the chapter 13 trustee moved for dismissal of Tabor II citing the Debtor's failure to begin Plan payments and ineligibility for chapter 13 relief due to the debt limit set forth under section 109(e) of the Bankruptcy Code.  On September 23, 2015, the court entered its order dismissing this Case on the chapter 13 trustee's motion.  Schaller's Pretrial Stmt., at ¶¶ 56, 59; U.S. Trustee's Pretrial Stmt., at ¶ 58.

oo)  Schaller has testified that he does not know whether the Debtor's eligibility to be a chapter 13 debtor was examined prior to the filing of Tabor I and Tabor II.  Schaller's Pretrial Stmt., at ¶ 61; U.S. Trustee's Pretrial Stmt., at ¶ 59; *see* U.S. Trustee Exh. No. 45, at p. 32.

pp)  Following the dismissal of Tabor II, the Kedzie Property was sold through a foreclosure sale.  On December 11, 2015, a Report of Sale and Distribution was filed with the Cook County Circuit Court indicating that the Kedzie Property was sold for $640,000.00, which, when applied to the amount owed of $1,157,749.84, resulted in a deficiency of $517,749.84.  U.S. Trustee's Pretrial Stmt., at ¶ 60; *see* U.S. Trustee Exh. No. 30.

## APPLICABLE LAW

Bankruptcy courts, like the other federal courts, have the authority to oversee and correct for attorney conduct.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) (The Supreme Court in *Chambers* has "reaffirmed the inherent power of the federal courts to address 'a full range of litigation abuses.'").

The tools available to the court vary, in part due to the nature and limited scope of the bankruptcy court system here in the United States.

A.    The Four Types of Authority

There are, essentially, four types of authority that might be invoked in situations such as the matters alleged herein: (1) the power to regulate behavior before it inherent in all courts; (2) the direct, specific authority of a statute or rule; (3) the ability to regulate the practice of the federal bar, as delegated to the court by the United States District Court for this District; and (4) the authority afforded specifically to the bankruptcy courts under section 105 of the Bankruptcy Code. *Cf. In re MJS Las Croabas Properties, Inc.*, 530 B.R. 25, 35 (Bankr. D.P.R. 2015) (discussing the sources of power of the bankruptcy court's authority to sanction), *aff'd sub nom. MJS Las Croabas Properties, Inc.*, 545 B.R. 401 (B.A.P. 1st Cir. 2016). Each type of authority has its own limitations, including, for example, scope, predicates, burdens and remedies.

Here, the U.S. Trustee invokes only the fourth type of authority. Much of Schaller's efforts, however, appear directed at the second. Because of that confusion, as well as the implicit question of how to deal with overlap, it is worthwhile, therefore, discussing each briefly in turn.

As to the first of these types of authority, the Supreme Court has provided a variety of examples of when a federal court might exercise its inherent authority. *Chambers*, 501 U.S. at 43-46. For example, the federal courts have the power to punish for contempts, to vacate judgments if procured through fraud, control courtroom behavior and assess costs and award fees. *Id.; see also Law v. Siegel*, 134 S. Ct. 1188, — U.S. —, 1194 (2014) (recognizing the inherent power of the bankruptcy court to sanction 'abusive litigation practices') (*quoting Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375-376 (2007)). The Seventh Circuit has stated that "[a] sanctioning court should ordinarily rely on available authority conferred by statutes and procedural rules, rather than its inherent power, if the available sources of authority would be adequate to serve the court's purposes." *Rimsat*, 212 F.3d at 1048-49 (*citing Chambers*, 501 U.S. at 50; *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1058-59 (7th Cir. 1998)). Though section 105 mirrors in many ways these inherent powers, section 105 is a statutory grant of authority, not an inherent power. Because neither the U.S. Trustee nor Schaller relies then on inherent authority, no more need be said here.

As to the second and most common type of authority, the statutes and rules abound with authorization to the courts in this realm. *See, e.g.*, 28 U.S.C. § 1927 (power to assess cost, expenses and attorneys' fees against counsel who multiplies the proceedings in any case unreasonably and vexatiously); Fed. R. Civ. P. 11(c) ("Rule 11") (sanctions for improper representations to the court);[15] Fed. R. Civ. P. 37(b)(2) (sanctions available for failure to make disclosures or cooperate in discovery); Fed. R. Bankr. P. 9011 (mirroring in most respects Rule 11 sanctions). In bankruptcy matters, the court also holds special power of attorneys' retention and compensation. *See* 11 U.S.C. §§ 327-330. While the U.S. Trustee does not rely on these forms of direct, specific authority, as is discussed below, Schaller presents much of his defense as if this is a Rule 11/Bankruptcy Rule 9011 matter. This merits more discussion, which the court will provide after considering the remaining two types of authority.

Third, as noted in *Chambers*, among the "powers incidental to all courts is the authority to 'control admission to its bar and to discipline attorneys who appear before it … .'" *United States v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003) (*citing Chambers*, 510 U.S. at 43). In the Northern District

---

[15]    To distinguish between the Civil Rules and the Bankruptcy Rules, rule references are made either as Rule __ for the former or Bankruptcy Rule ___ for the latter.

of Illinois, the bankruptcy bar is made of attorneys admitted to practice before the District Court. Bankr. N.D. Ill. R. 2090-1(A). There is no separate admission to practice before the bankruptcy court. As such, this authority rests primarily with the District Court, which has in the exercise of that authority adopted rules of professional conduct. N.D. Ill. R. 83.50; *see also* Bankr. N.D. Ill. R. 9029-4A (making the District Court rules of professional conduct directly applicable in bankruptcy matters). The District Court has also enacted rules of disciplinary procedure. N.D. Ill. R. 83.25-83.30 (the "NDIL Disciplinary Rules"). Those rules contain a savings provision, reserving for "a district judge, magistrate judge or bankruptcy judge of this Court" the authority "to maintain control over proceedings conducted before that district judge, magistrate judge or bankruptcy judge." N.D. Ill. R. 83.25(c).

As previously noted, the District Court has delegated to the bankruptcy court the power to conduct disciplinary proceedings itself, rather than rely on the District Court for such. Bankr. N.D. Ill. R. 9029-4B; *see also* N.D. Ill. General Order 18-0007 (adopting the local bankruptcy rules); Bankr. N.D. Ill. R. 1000-2 (specifying that the local bankruptcy rules are promulgated by both the District Court and the bankruptcy court). The scope of the Bankruptcy Court Disciplinary Rules is limited to violations of the NDIL Disciplinary Rules. Bankr. N.D. Ill. R. 9029-4B(A)(1)(a).

Last, Congress has expressly bestowed power to the bankruptcy court in section 105 of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *Owens v. LVNV Funding, LLC*, 832 F.3d 726, 732 n.5 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 2157 (2017); *In re Bryson*, 131 F.3d 601, 603 (7th Cir. 1997); *Volpert*, 110 F.3d at 500.

"Section 105 grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process." *Volpert*, 110 F.3d at 500. This section empowers bankruptcy courts to sanction conduct that abuses the judicial process. *Id.*; *see also In re Varan*, Case No. 11-44072, 2014 WL 2881162, at *4 (Bankr. N.D. Ill. June 24, 2014) (Cassling, J.).

B.     Section 105's Overlap with Other Powers

In *Marrama*, the Supreme Court considered whether, despite the plain language of section 706(a), a bankruptcy court might deny a request to convert a chapter 7 case to one under chapter 13 when the debtor would be unentitled to receive chapter 13 relief. 549 U.S. at 371-76. There the Supreme Court cited to both section 105 and the inherent power of the court as dual sources of authority to do just that. *Id.* at 375-76. *But see Siegel*, 134 S. Ct. at 1191 (referring to *Marrama* holding as dictum).

As in *Marrama*, the bankruptcy court's power under section 105 often goes hand-in-hand with its inherent power. For that reason, it is useful to consider what the courts have said about the overlap between a federal court's inherent powers and specific statutory or rule-based authority, and see if parallels can be drawn to the use of section 105.

The Supreme Court stated in *Chambers* that "[w]e discern no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions for the bad-faith conduct described above. These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions." *Chambers*, 501 U.S. at 46. Under *Chambers*, the Seventh Circuit has similarly

stated that, "[a]lthough the exercise of the inherent power may be limited by statute or rule, it is still possible in appropriate circumstances for a court 'to sanction bad-faith conduct by means of the inherent power' even if 'that conduct could also be sanctioned under the statute or the Rules.'" *Manez*, 533 F.3d at 585 (citations omitted).

Further in that regard, the District Court has stated as follows:

"But if in the informed discretion of the court, neither [a] statute nor the Rules are up to the task, the court may safely rely on its inherent power." This authority is properly exercised under circumstances where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," because "requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." Accordingly, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."

*Flextronics Int'l, USA, Inc. v. Sparkling Drink Sys. Innovation Ctr. Ltd.*, 230 F. Supp. 3d 896, 907 (N.D. Ill. 2017) (all quotations to *Chambers*) (citations omitted); *see also Rimsat*, 212 F.3d at 1048-49 (authorities need not be applied "in a piecemeal fashion where only a broader source of authority is adequate to justify all the necessary sanctions").

This is not to say that the bankruptcy court may use section 105 to circumvent an express statutory limitation. *See infra* (discussion the limitations on section 105 authority); *see also Kovacs v. United States*, 614 F.3d 666, 674 (7th Cir. 2010) (section 105 cannot be used to sanction the IRS where the Internal Revenue Code sets forth a remedy which is exclusive). As noted by the Seventh Circuit, however,

where Congress has limited the powers of the bankruptcy court, it has done so clearly-for example, by expressly limiting the court's power, *see* 11 U.S.C. § 105(b) ("[A] court may not appoint a receiver in a case under this title"), or by creating requirements for plan confirmation, *see, e.g.*, 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if the following requirements are met ... .").

*Airadigm Comm'ns, Inc. v. Fed. Commc'ns Comm'n (In re Airadigm Comm'ns, Inc.)*, 519 F.3d 640, 656 (7th Cir. 2008). There is no such express statutory limitation applicable here. *Cf. DeLauro v. Porto (In re Porto)*, 645 F.3d 1294, 1302 (11th Cir. 2011) (section 105 "permits bankruptcy courts to impose sanctions for conduct in violation of Bankruptcy Rule 9011"); *Volpert*, 110 F.3d at 500 (bankruptcy court's sanction under 28 U.S.C. § 1927 for multiplying proceedings unreasonably and vexatiously affirmed under section 105 authority). In sum, the existence of a narrower authority does not supplant the ability to use the broader power of section 105, so long as the use of section 105 does not contravene an express limitation in the statute or the rules. *See Siegel*, 134 S. Ct. at 1194.

Here, because he felt that the conduct of Schaller was so intertwined between the various types of authority, the U.S. Trustee has predicated this action solely under section 105. Mtn., at pp. 11-12.

The court agrees with this choice. Like the inherent powers of the court, section 105 allows the court to address conduct without extensive and needless satellite litigation. An action under section 329 of the Bankruptcy Code, for example, would appear to necessitate the reopening of Tabor I and bringing of a parallel motion there to capture those fees, as the scope of section 329 appears limited to the case in which it is brought. 11 U.S.C. §§ 329(a), (b). Section 105's power, on the other hand, does not appear so limited, speaking instead to "the provisions of this title." 11 U.S.C. § 105(a). Actions under Bankruptcy Rule 9011 focus on the representations to the court, and only focus on conduct insofar as it underlies those representations, and the Bankruptcy Court Disciplinary Rules, while perhaps better suited to catch behavior in unrelated cases, are by their terms limited to violations of the NDIL Disciplinary Rules.

Further, as the foregoing cases make clear, section 105's power can coexist with those available under more specific statutes or rules, and in a parallel manner to the application of the court's inherent authority in such situations, section 105 may be the sole authority for relief when such a broader source of authority is justified.

The actions complained of here are varied and strike to the very heart of practice before this court. Section 105 is, therefore, exactly the source of authority under which this action can and should be propounded.

C.    Standards under Section 105

As noted above, each type of authority has its own scope and predicates, burdens and remedies.

Per the express terms of section 105, the action must be necessary or appropriate. 11 U.S.C. § 105(a). But what other limitations on scope and predicates apply? First and foremost, the action must be limited in scope to the matters arising within the boundaries of the Bankruptcy Code and bankruptcy matters. *Disch v. Rasmussen*, 417 F.3d 769, 777 (7th Cir. 2005). Bankruptcy judges do not have "free-floating discretion to redistribute rights in accordance with [their] personal views of justice and fairness, however enlightened those views may be." *In re Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986); *see also In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) ("section 105(a) does not give the bankruptcy court carte blanche").

The exercise of section 105 authority in this instance is in keeping with the scope limitations discussed above and in *Marrama* by using section 105 to further the express will of Congress as set forth in the Bankruptcy Code in situations where the drafting falls short of the unique circumstances before the court. *Cf. Caesars*, 808 F.3d at 1188-89 (bankruptcy courts may use section 105 to further the Bankruptcy Code's "central objectives"). The compensation and behavior of attorneys practicing before the court is such a matter. *In re Kindhart*, 160 F.3d 1176, 1177 (7th Cir. 1998) (it is "an important matter not only to attorneys, but to the courts and the public"); *Brent*, 458 B.R. at 449 (citation omitted). "This Court has an obligation to review practice before it to preserve the integrity of the bankruptcy process." *In re Rusty Jones, Inc.*, 134 B.R. 321, 345 (Bankr. N.D. Ill. 1991) (Schmetterer, J.). Such matters clearly strike to the central objectives of the Bankruptcy Code.

It should be noted that many of the alleged violations of the Bankruptcy Code that are at issue here result in penalties to the client, not the attorney. Failure to file accurate schedules or present a confirmable plan may result in denial of discharge, dismissal or conversion of the case or

even dismissal with prejudice. *See, e.g.*, 11 U.S.C. §§ 727(a), 1307(c), 349. Each of these may have a lasting effect on the debtor. Protecting against these outcomes as a result of neglect may or may not fall within the scope of narrower rules such as Bankruptcy Rule 9011, but is certainly also a central objective of the Bankruptcy Code. The use of section 105 is necessary and appropriate in such circumstances.

Here, there is no question that both the initial movant's burden that exists in all matters and the burden of going forward fall on the U.S. Trustee. *In re Whitlock-Young*, 571 B.R. 795, 810 (Bankr. N.D. Ill. 2017) (Barnes, J.). In the absence of a specific allocation of burdens, the movant bears the burden, as they do in all civil matters. *In re KMart Corp.*, 381 F.3d 709, 714 (7th Cir. 2004); *Boone Cty. Utils., LLC v. The Branham Corp. (In re Boone Cty. Utils., LLC)*, Case No. 03-16707-RLM-11, 2015 WL 2233951, at *14 (Bankr. S.D. Ind. May 8, 2015) ("The party requesting sanctions under § 105 bears the burden of proof.").

In all civil matters generally, that burden is by the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). While a request for punitive damages, even in a civil matter, might require more, "there is no general requirement of proof by clear and convincing evidence" in matters such as Rule 11 sanctions. *S.E.C. v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 545 (7th Cir. 2012); *Powers v. Chicago Transit Auth.*, Case No. 87 C 1600, 1990 WL 92887, at *13 (N.D. Ill. June 15, 1990) (applying "lesser preponderance-of-the-evidence standard" in the context of Rule 11 and 28 U.S.C. § 1927 sanctions). *But see Varan*, 2014 WL 2881162, at *6 (requiring a higher, clear and convincing standard).

But more to the point, the question is: What does this burden ask of the U.S. Trustee? What is he required to show?

Schaller makes much of the requirements of Bankruptcy Rule 9011, arguing that the court take into consideration 9011's focus on deterrence or otherwise use 9011 case law as a guide. In so doing, Schaller encourages the court to find that Schaller cannot be held liable for his filings on behalf of the Debtor as they were the product of his reasonable inquiries and beliefs resulting therefrom. While such a guide may be helpful, this not a Bankruptcy Rule 9011 action and thus the applicable standard is not necessarily the one under that rule, much in the same way this court need not find that Schaller multiplied the proceedings in this Case unreasonably and vexatiously, as this is not a section 1927 matter. As the Seventh Circuit has made clear, just because an action under section 105 encompasses acts which have their own explicit standards does not mean that the bankruptcy court must meet those standards when acting under section 105. *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993) (a bankruptcy court need not meet all the traditional preliminary injunction standards when enjoining a matter using section 105 authority).

Nor is it necessary, as Schaller argues, for the U.S. Trustee to show that Schaller's conduct rises to the level of an abuse of process. That provision in section 105(a) is in the savings clause, not the grant of authority. It exists to clarify the court's power to prevent abuses of process and not as a limitation on the Bankruptcy Code's express provisions. It is not a precondition on the exercise of the authority expressly conferred in section 105. True, when the Seventh Circuit focused on that language in *Volpert*, 110 F.3d at 500, it did so in the context of what was a clear abuse of process. It would be an incorrect reading of *Volpert* and section 105 to conclude that section 105 only applies where an abuse of process has been shown.

Finally, it is not necessary, as Schaller argues, for the court to make a specific finding of bad faith to support the U.S. Trustee's cause. In making this argument and the immediately preceding argument, Schaller perilously relies on bankruptcy cases from outside of this jurisdiction. He would do well to look closer to home. In *Rimsat*, the Seventh Circuit stated that "we will not reverse an order imposing sanctions merely because the sanctioning court did not make an explicit finding of 'bad faith.'" *Rimsat*, 212 F.3d at 1047. In so doing, the *Rimsat* court noted that it offers no opinion on "whether bad faith is required for a bankruptcy court to exercise its authority under 11 U.S.C. § 105(a)." *Id.* at 1047 n.5. As with abuse of process, nothing in the language of section 105 conditions the court's authority in that way.

The foregoing shows more what a movant need not show than what it must. Nonetheless, in sum, the court holds that a movant, in invoking the sanction powers of the bankruptcy court, must show the necessity or appropriateness of court action on a matter within the confines of and that goes to the central objectives of bankruptcy and that the requested court action does not contravene a specific limitation of authority found in the statute or rules. While in determining appropriate action, the court may be guided by the predicates for parallel forms of relief, *Volpert*, 110 F.3d at 500, but it is not necessarily bound by those predicates. *L & S Indus., Inc.*, 989 F.2d at 932.

Of course, part of what a movant must show stems from the remedies the movant seeks. If, for example, it seeks a finding of contempt under section 105, it seems appropriate that the movant meet some or all of the requirements for contempt that are otherwise extant. *See, e.g., Holloway v. Household Auto. Fin. Corp.*, 227 B.R. 501, 505 (N.D. Ill. 1998). If, on the other hand, the movant seeks an injunction, it is equally likely that the movant will need to show at least some of the traditional requirements for an injunction. *L & S Indus., Inc.*, 989 F.2d at 932 (requiring some, but not all, of the tests for a preliminary injunction to be met).

Here, the U.S. Trustee seeks what are in essence three forms of monetary relief: (1) refund of all fees collected from the Debtor in the Tabor I and Tabor II matters; (2) a sanction of $5,000.00 or more against Schaller for his alleged conduct; and (3) reimbursement of the U.S. Trustee's fees and costs.[16] The first and the third categories fall clearly within the court's authority to award compensatory damages under section 105 and, provided they are derivative from and proportionate in relation thereto, follow any finding of culpability on Schaller's part. *Cox v. Zale Del., Inc.*, 239 F.3d 910, 916-17 (7th Cir. 2001); *see also United States v. United Mine Workers*, 330 U.S. 258, 298-99 (1947); *Shakman v. Democratic Org. of Cook County*, 533 F.2d 344, 349-50 (7th Cir.), *cert. den.* 429 U.S. 858 (1976).

The U.S. Trustee's request for a sanction of $5,000.00 or more is another matter. Despite, what was perhaps careful phrasing, the request that the fine be levied "to dissuade Schaller, and similarly situated attorneys, from engaging in [this] type of misconduct," the court cannot reasonably find this request to fall within its authority under section 105.[17] As Seventh Circuit noted in *Zale*, the

---

[16]    The U.S. Trustee also asks that the court censure Schaller for his conduct and asks that this Memorandum Decision be published as that censure. In the context of the matters before it, the court does not view that as a separate remedy as, given the importance of the matters discussed herein, the court would choose to publish the Memorandum Decision in any event.

[17]    Congress has granted the bankruptcy court the power to impose punitive sanctions in some circumstances. *See, e.g.,* 11 U.S.C. § 362(k)(1). Absent a direct grant, however, the bankruptcy court will not impose punitive remedies.

court's power to award civil damages is straightforward. Its power to award criminal ones is not. *Zale*, 239 F.3d at 916 ("[I]t is unsettled whether bankruptcy judges have criminal-contempt powers."). The request does not appear to be compensatory and thus appears more punitive than remedial. As such, the court declines to entertain this request under section 105.

D.    Good Faith, Revisited

Schaller contends that the U.S. Trustee cannot succeed on its request under section 105 absent a showing of bad faith. Not so, as has been amply demonstrated above. However, because a showing of bad faith has been held to satisfy the standards for section 105 relief, if the U.S. Trustee does show bad faith, the inquiry is satisfied. If the showing is not so clear, however, this will necessitate a further honing of the standards.

Several of the U.S. Trustee's Claims may, as Schaller appears to assert, be collapsed into an inquiry into good faith. While, as noted above, it is not necessary for this court to find bad faith to find that Schaller's conduct is sanctionable under section 105, a finding of bad faith would certainly satisfy the U.S. Trustee's burden.

"Chapter 13 does not explicitly contain a good faith requirement for the filing of a petition. Nevertheless, Section 1307(c) of the Bankruptcy Code does state that Chapter 13 petitions may be dismissed 'for cause.' This court has indicated that lack of good faith is sufficient cause for dismissal under Chapter 13." *In re Love*, 957 F.2d 1350, 1354 (7th Cir. 1992) (citations omitted). Thus "[t]he bankruptcy court is often called to make … [a determination of] whether the debtor filed the Chapter 13 petition in good faith." *Id.*

As the Seventh Circuit explained, courts take into account

> the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* at 1357; *see also In re Sidebottom*, 430 F.3d 893, 899 (7th Cir. 2005) (clarifying that the list is nonexhaustive); *Shell Oil Co. v. Waldron (In re Waldron)*, 785 F.2d 936, 941 (11th Cir. 1986) (in the context of section 1325(a)(3), stating that "[u]nmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.").

Ultimately, the Seventh Circuit has "directed the bankruptcy courts to look at the totality of the circumstances and, thereby, make good faith determinations on a case-by-case basis." *Love*, 957 F.2d at 1355.

In the matter before the court, neither of the first two factors in *Love* appear to be implicated. Each of the remaining four, however, are. As was the *Sidebottom* court, however, the U.S. Trustee here is particularly focused on Schaller's motive for filing the bankruptcy petitions. In *Sidebottom*, the Seventh Circuit found on the record suggestion that the bankruptcy was filed to save

the expense of defending a pending action. 430 F.3d at 899-90 (stating that "[n]one of this sounds like a proper use of the bankruptcy procedures to us").

Schaller's own advertising and other materials make it clear that the primary purpose of Surrender Method cases is to buy time. His solicitations to debtors, including the Debtor in this case, make that clear. U.S. Trustee Exh. No. 22 (offering a "guarantee" of stopping the impending sheriff's sale); U.S. Trustee Exh. No. 4 ("Let me help you STOP any pending SHERIFF SALE (assuming you qualify) and try to get an additional 100 days. What would you feel about an extra 100 days?").

Such a motivation has contributed to the totality of circumstances underlying a finding of bad faith. *Wright v. Bank of Louisville*, Case No. 92-2951, 1993 WL 138999, at *4 (7th Cir. April 30, 1993) (affirming a bankruptcy court finding that the debtor was "merely attempting to delay the collection attempts of his creditors"). The protection of the automatic stay is a derivative effect of the filing for bankruptcy. *In re Strug-Div., LLC*, 375 B.R. 445, 449 (Bankr. N.D. Ill. 2007) (Schmetterer, J.); *see also In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013) (Barnes, J.) (*quoting Strug-Div.*). "The abusive debtor also obtains the protection of the automatic stay but employs it to delay or thwart creditor action while refusing to fulfill the duties imposed by the Bankruptcy Code." *In re Robinson*, 198 B.R. 1017, 1021 (Bankr. N.D. Ga. 1996). Thus, "the [c]ourt must be careful not to deny the protection of the Bankruptcy Code to a debtor whose legitimate efforts at financial rehabilitation may be hidden among derivative benefits (such as the delay of creditors resulting from the automatic stay) that, if viewed alone, might suggest bad faith." *Strug-Div.*, 375 B.R. at 449.

Obtaining the stay's protection cannot stand alone as the goal of a bankruptcy filing. *In re Carrera*, Case No. BAPNC151383KITAJU, 2016 WL 4400652, at *8 (B.A.P. 9th Cir. Aug. 16, 2016), *aff'd sub nom. In re Vizconde*, Case No. 16-60072, 2017 WL 5770034 (9th Cir. Nov. 29, 2017) (affirming a bankruptcy court's sanctions under Bankruptcy Rule 9011 where a case was filed "'just to buy time to cut a deal,' which the court noted was 'not a proper purpose for filing a bankruptcy case'"); *In re Prometheus Health Imaging, Inc.*, Case No. BAP CC-14-1576-FKIKU, 2015 WL 6719804, at *6 (B.A.P. 9th Cir. Nov. 2, 2015) ("abuse of the automatic stay or use of other litigation tactics unrelated to reorganization can constitute bad faith"); *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 279-80 (Bankr. S.D.N.Y. 2010) (bankruptcy "may not be used 'simply to buy time or to avoid creditors'") (citation omitted).

Such filings are serious abuses. The Ninth Circuit, on appeal from the Bankruptcy Appellate Panel's decision in *Carrera*, affirmed the imposition of sanctions against an attorney who invoked the stay solely to delay foreclosures, finding that the conduct meets an "even the higher 'akin to contempt' standard" under Bankruptcy Rule 9011. *Vizconde*, 2017 WL 5770034, at *1. Congress expressed its condemnation of such abuses by crafting an *in rem* bar against stay protection in the instance of repeated attempts to delay creditors holding claims in real property. 11 U.S.C. § 362(d)(4).

Again, combined with a legitimate pursuit of bankruptcy relief, the invocation of stay protections is not proscribed, even if stay protection is paramount. But the courts that have considered whether that legitimate relief can be the nonbankruptcy modification of debts have concluded that it cannot. *In re Snyder*, Case No. 10-32042, 2011 WL 612254, at *1 (Bankr. E.D. Wis. Feb. 11, 2011) (buying time for loan modification is not a legitimate use of bankruptcy); *Robinson*, 198 B.R. at 1021 (same); *In re Colonial Manor Assoc., Ltd.*, 103 B.R. 315, 319 (Bankr. M.D. Fla. 1989)

("This is nothing more than a secured creditor wanting to foreclose and a debtor wanting to buy time. The issues should be resolved in the non bankruptcy forum."). The *Robinson* court, upon which *Snyder* relied, says it as follows:

> Using the automatic stay and the filing of the petition as a shield to buy time to negotiate a loan refinancing abuses the bankruptcy system. The harm which devolves is not limited to the affected creditor. By example and word of mouth, the "technique" spreads until it is no longer perceived by the Bar or by debtors as an abuse but as a permissible manipulation of the system. In the meantime, respect for the bankruptcy system, including attorneys who wish to assist honest debtors, deteriorates. When public respect for any part of the legal system falters, it harms everyone involved in the system.

*Robinson*, 198 B.R. at 1025; *see also Snyder*, 2011 WL 612254, at *2 (*quoting Robinson*). In both *Robinson* and *Snyder*, the bankruptcy court sanctioned the counsel who facilitated such conduct. *Robinson*, 198 B.R. at 1025; *Snyder*, 2011 WL 612254, at *2.

Both *Robinson* and *Snyder* are troublingly on point to the matter before the court. In *Robinson*, the court condemned a practice of filing a chapter 13 case to obtain the protection of the automatic stay yet doing nothing to prosecute that case otherwise. *Robinson*, 198 B.R. at 1025. As the court there observed, "by doing *nothing* to prosecute the Chapter 13 case properly, Debtor could reasonably expect to receive the protection of the stay until the confirmation hearing ... ." *Robinson*, 198 B.R. at 1022. There, counsel admitted that the case—the second in a calendar year for the same purpose—was about buying time to consummate a refinancing in the face of an imminent foreclosure. *Id.*

Here, the Case is the Debtor's second in a calendar year, filed in the face of an imminent foreclosure with the purpose of buying time to permit the Debtor to renegotiate his mortgage obligations. In Tabor I, with virtually none of the required documents on file, the case was dismissed after 105 days, nearly spot on with the 100 days advertised by Schaller. U.S. Trustee Exh. No. 4 ("Let me help you STOP any pending SHERIFF SALE (assuming you qualify) and try to get an additional 100 days. What would you feel about an extra 100 days?").

In *Snyder*, the debtor's counsel filed a chapter 7 case for which the debtor was ineligible. The creditor who the debtor sought to delay did not come forward, but the U.S. Trustee brought the matter to the court's attention. *Snyder*, 2011 WL 612254, at *2. It is unclear how long *Snyder* lasted before being dismissed for ineligibility. In Tabor II, which was filed exactly two months after Tabor I was dismissed but while Tabor I was still open, with required documents but no Plan payments having been made and in the face of an eligibility challenge, the case was dismissed after only 51 days, prior to the first confirmation hearing.

In addition to the other factual overlap with *Robinson* and *Snyder*, the timing here, especially in relation to Schaller's marketing and the applicable timing under the Bankruptcy Rules and Bankruptcy Code, is remarkable. The outside date for a section 341 meeting of creditors in a chapter 13 case is 50 days in ordinary circumstances and 60 if certain conditions are met. Fed. R. Bankr. P. 2003. The outside date for the first confirmation hearing in a chapter 13 case is 45 days after the section 341 meeting of creditors. Together, this brings outside the date (in a jurisdiction overrun with chapter 13 case, thus susceptible to delay) to 95 to 105 days. Assuming dismissal at the

first confirmation hearing as was noted in *Robinson*, Schaller's estimate of additional time afforded a debtor to stay in their home is spot on.

This timing might be a result of the projected loan modification turnaround, but if it is, that was not made clear to the court.

If this process was truly about a successful bankruptcy irrespective of the loan modification, one would think that Schaller would train his attorneys on how to deal with the outcomes. He did not. For example, Pollak testified that that he would not know how to analyze the likelihood of the Debtor's success with a modification against the effect it would have on a chapter 13 filing. Tr. at p. 40, Nov. 29, 2017.

Given all of the foregoing, as well as Schaller's own testimony, the solicitation sent to the Debtor, other marketing materials made available by Schaller and the agreements between him and the Debtor narrowing the focus of the bankruptcy to the loan modifications with which he offered no assistance, the court has little hesitation in concluding that this Case was improperly motivated.

Because bad faith is considered in the totality of circumstances, even where such motivation exists, it is necessary for the court to look at the other factors involved. For that reason, and because bad faith is not the sole inquiry in a section 105 proceeding, the court will look further, including the overall circumstances in which conduct such as the foregoing occurred, if it in fact did occur.

E.     Bankruptcy Rule 9011, Revisited

In similar fashion, Schaller defends against the section 105 relief sought by the U.S. Trustee by attempting to show that his inquiry into the facts was reasonable, a test under Rule 11 and Bankruptcy Rule 9011. Again, as demonstrated above, that standard does not govern a section 105 inquiry. Nonetheless, as in the case of bad faith, Schaller's inquiry into the facts has some bearing and should that inquiry prove to be unreasonable in light of a showing by the U.S. Trustee of the elements of Rule 11 and Bankruptcy Rule 9011 culpability, it would appear that the U.S. Trustee's section 105 inquiry is satisfied.

As with Rule 11, under Bankruptcy Rule 9011, an attorney may be sanctioned for her representations to the court if, among other things, those representations are presented for an improper purpose, including to cause unnecessary delay. Fed. R. Bankr. P. 9011(b)(1); Fed. R. Civ. P. 11(b)(1). The factual contentions of those representations must also have evidentiary support. Fed. R. Bankr. P. 9011(b)(3); Fed. R. Civ. P. 11(b)(3). Bankruptcy Rule 9011 and Rule 11 each contain what appears to be a savings clause relating to the attorney's "inquiry reasonable under the circumstances" and based on "knowledge, information, and belief." Fed. R. Bankr. P. 9011(b)(1), (2); Fed. R. Civ. P. 11(b)(1), (2).

Schaller makes much of this savings clause, arguing that his inquiry into the facts and the circumstances of both the Debtor's eligibility and the Debtor's Schedules was reasonable.

Schaller is correct insofar as his filings on behalf of the Debtor with the bankruptcy court constitute representations that fall within the ambit of Bankruptcy Rule 9011. Fed. R. Bankr. P. 9011(b) (stating that the rule applies to "a petition, pleading, written motion, or other paper" that is signed, filed, submitted or later advocated). As noted above, the filing of a petition for an improper

purpose has been held to be sanctionable under Bankruptcy Rule 9011. *Vizconde*, 2017 WL 5770034, at *1; *In re EHC, LLC*, Case No. 15 B 40866, 2017 WL 1655302, at *6 (Bankr. N.D. Ill. Apr. 25, 2017) (Cox, J.) (attorney "violated Rule 9011 when he presented the petitions for bankruptcy relief … solely to avoid the appointment of the receiver in the state court foreclosure case, which improper purpose caused delay and needless increase in the cost of litigation"); *In re Dental Profile, Inc.*, 446 B.R. 885, 903 (Bankr. N.D. Ill. 2011) (Cox, J.) (Bankruptcy Rule 9011(b)(1) was violated by the filing of the bankruptcy case for improper purpose).

The same is true for inaccurate schedules. *In re Famisaran*, 224 B.R. 886, 892 (Bankr. N.D. Ill. 1998) (Squires, J.) (levying Bankruptcy Rule 9011 sanctions and stating in so doing that "[t]he Court will not condone nor excuse or overlook the filing of false, inaccurate and misleading Schedules"); *see also Parker v. Jacobs*, 466 B.R. 542, 554 (M.D. Ala.), *aff'd sub nom. In re Parker*, 485 F. App'x 989 (11th Cir. 2012) (affirming bankruptcy court's district-wide disbarment of attorney under Bankruptcy Rule 9011(c) for filing false petitions and schedules under Bankruptcy Rule 9011(b)(3)); *In re Withrow*, 405 B.R. 505, 512 (B.A.P. 1st Cir. 2009) (attorney had an "affirmative duty to conduct a reasonable inquiry into the facts set forth in the Debtor's schedules").

What constitutes an "inquiry reasonable" under the circumstances must be taken up on a case-by-case basis. In one recent case, the bankruptcy court found a Bankruptcy Rule 9011(b)(3) where an attorney failed to conduct an inquiry reasonable under the circumstances regarding the debtor's schedules, including a failure to obtain the information so as to accurately reflect a debtor's mortgage obligations. *Desiderio v. Parikh (In re Parikh)*, 508 B.R. 572, 590 (Bankr. E.D.N.Y. 2014). As one bankruptcy court recently stated:

> When a debtor and his lawyer work together to file schedules and statements, both are under a duty to take sufficient action to make sure that the disclosures are accurate and complete. Rule 1008 of the Federal Rules of Bankruptcy Procedure requires that all petitions, lists, schedules, and statements be filed under the penalties for perjury. Rule 9011 places a duty upon a lawyer to make an inquiry reasonable under the circumstances to make sure that the papers he files are accurate.

*DePaola v. Dorsey (In re Dorsey)*, Case No. 09-11157-WRS, 2011 WL 4914841, at *5 (Bankr. M.D. Ala. Oct. 17, 2011). The *Dorsey* case points out the very issue this court previously alluded to, that the misstatements of a lawyer in these contexts redounds upon the client. *Id.* at *6 (*citing to Pioneer Inv. Servs. v. Brunswick Assocs., Ltd.*, 507 U.S. 380, 396 (1993)). There the court held that "even if all of the wrongdoing was solely the fault of [the lawyer], [the client] would nevertheless suffer the consequences as a result of the 'your lawyer, your fault rule.'" *Id.*

"Whether a contention fails to clear that bar is determined by 'an objective inquiry into whether the party or his counsel should have known that his position is groundless.'" *Native Am. Arts, Inc. v. Peter Stone Co., U.S.A.*, 222 F. Supp. 3d 643, 644-45 (N.D. Ill. 2016) (*quoting Cuna Mut. Ins. Soc. v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006)) (in the context of Rule 11).

Once again, these are serious matters. In *Husain*, Judge Cox rightfully took an attorney to task for his failure to respect formalities in the preparation of schedules, stating that his "practices with respect to the execution of what are supposed to be sworn bankruptcy documents is severely prejudicial to the bankruptcy system in particular and to the administration of justice in general."

29

*Husain*, 533 B.R. at 697. The procedure, brought under the Bankruptcy Court Disciplinary Rules, resulted in the permanent disbarment of the attorney in question. *Id.*

The foregoing makes clear that Schaller's reliance on the reasonable inquiry safe harbor in Bankruptcy Rule 9011 under the facts of this Case is problematic. When a lawyer takes it upon herself to generalize answers for clients or fails to conduct the diligence necessary to provide accurate schedules, the reasonableness of that lawyer's inquiry in relation thereto is called into question. Nonetheless, because the standards set forth under Bankruptcy Rule 9011 do not form the entirety of this court's inquiry in a section 105 proceeding, the court will look further, including the overall reasonableness and objectivity of Schaller's inquiry and representations in light of the facts of this Case.

## DISCUSSION

Having considered the applicable law, the court now turns to each of the U.S. Trustee's Claims, in order.

A.    Claim 1:

"Claim 1" states as follows:

Robert Schaller caused Elton Tabor to be counseled to file Chapter 13, as opposed to Chapter 7, for the primary purpose of furthering Robert Schaller's pecuniary interests. Facing foreclosure of his home in February 2015, and again in July 2015, Mr. Tabor responded to one of Robert Schaller's letters by turning to the Schaller Law Firm for help. Although Mr. Tabor lacked the financial resources to save his home through Chapter 13 bankruptcy, and although he was not even eligible to be a Chapter 13 debtor due to the debt limits, Robert Schaller filed two Chapter 13 petitions on his behalf.

U.S. Trustee's Pretrial Stmt., at p. 1.

The elements of the U.S. Trustee's assertion are as follows: (i) that the Debtor was ineligible for chapter 13 relief; (ii) that Schaller caused a chapter 13 to be filed nonetheless; and (iii) that the reason this occurred is because of Schaller's desire for financial gain. The court will consider each element in turn.

1.    *The Debtor Was Ineligible for Chapter 13 Relief*

"The purpose of Chapter 13 is to enable an individual, under court supervision and protection, to develop a repayment plan under which creditors would be paid over an extended period rather than having the individual liquidate his assets under a straight Chapter 7 bankruptcy." *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751, 756 (6th Cir. 1985). "Chapter 13 allows the debtor to retain his property and avoid the stigma of a straight bankruptcy." *Id.* "Generally, Chapter 13 is simpler, speedier, and less expensive than Chapter 11." *Id.*

To keep out those debtors who should not have the benefit of chapter 13, Congress enacted strict eligibility requirements for chapter 13 cases. *Id.* at 753-54. Those eligibility requirements are set forth in section 109(e) of the Bankruptcy Code, which states, in pertinent part, that "[o]nly an

individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $394,725 and noncontingent, liquidated, secured debts of less than $1,184,200 ... may be a debtor under chapter 13 of this title." 11 U.S.C. § 109(e).

"Most courts ... hold that what the debtor owes for purposes of section 109(e) is determined by the amounts in his schedules; other evidence is considered only to ensure that the schedules were prepared in good faith." *In re Hansen*, 316 B.R. 505, 508 (Bankr. N.D. Ill. 2004) (Goldgar, J.); *see also Comprehensive Accounting*, 773 F.2d at 756 ("Chapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith."); *In re Pantazelos*, 540 B.R. 347, 350-51 (Bankr. N.D. Ill. 2015) (Schmetterer, J.) (bankruptcy courts may look beyond the schedules when a good faith objection is raised).

The Seventh Circuit, for example, has condoned a bankruptcy court's looking beyond the schedules when it appeared that the schedules were misleading. *Sidebottom*, 430 F.3d at 900. In *Sidebottom*, a debtor had scheduled a debt as "unknown" when a complaint filed against the debtor in state court alleged specific amounts due. *Id.* The debtor also checked petition boxes for the claim as contingent, unliquidated and disputed. *Id.* The bankruptcy court, however, in looking at the state court complaint, determined that the debt was neither unknown nor contingent and the Seventh Circuit affirmed. *Id.* at 900-901.

Because the burden lies with the debtor to prove eligibility for bankruptcy relief, *Pantazelos*, 540 B.R. at 351, holding a debtor to what she schedules under oath but allowing an inquiry into the veracity of those schedules makes sense. A debtor who manipulates her schedules to appear eligible when she is not, runs the risk of both of being found ineligible and to be acting in bad faith.

Here, the Debtor's Schedules reflect a debtor who was unqualified under the Bankruptcy Code to file for chapter 13. Specifically, the Debtor's Schedules reflect secured debt totaling $1,268,380.27. That is taken directly from Schedule A. The unsecured debt, on the other hand, is based on a calculation. *In re Miller*, 493 B.R. 56, 58 (Bankr. N.D. Ill. 2013) (Goldgar, J.). One begins with the amount the Debtor scheduled on Schedule F, $80,218.39. Next one adds to that the total of the unsecured amounts set forth on Schedule A, in this case $691,807.27. Together that is the total amount of unsecured debt, in this case, $772,025.66. The Debtor's scheduled amounts for secured and unsecured debt both exceed the applicable debt limits in section 109(e).

In light of the foregoing, Schaller puts forth a variety of arguments. First, he challenges the amounts in the Schedules, claiming that they were incorrectly calculated and that the Debtor was eligible. Next, he argues that he and his employees reasonably believed that the Debtor was eligible. Schaller also, at points, appears to veer away from the debt eligibility question to defend his belief that the Debtor had regular income sufficient to support a chapter 13 plan. Last, Schaller attempts to distance himself from the actual documents on file, both by arguing that they do not reflect his reasonable beliefs regarding eligibility and by laying off any blame associated with them on his associates.

None of Schaller's arguments, however, can deflect this matter from the objective truth that the Schaller Firm filed Tabor II based on Schedules that, on their face, reflected a debtor who was ineligible for chapter 13 relief under section 109(e). Any reasonable inquiry into the very documents that were prepared by the Schaller Firm would have led Schaller to the conclusion that the contention that the Debtor was eligible was groundless.

31

Not only was the Debtor ineligible, but Schaller did not contest dismissal of Tabor II on that, or any other ground. In both Tabor I and Tabor II, there is no indication that Schaller or anyone at the Schaller Firm defended any of the multiple motions to dismiss. In Tabor I, there were three motions to dismiss pending at the time of dismissal, each grounded in a failure to perform basic case requirements. In Tabor II, the unreasonable delay motion which contained both an allegation of failure to perform basic case requirements and the eligibility contention was granted on the first hearing thereon. It was only once Schaller had a personal stake in the outcome that he stepped forward with these arguments.

The exhibits and testimony presented to the court make clear that the "Surrender Method" is entirely about debtors and their homes. Yet the Schedules themselves, prepared and filed by Schaller or his associates either did not accurately reflect the home and the debt on it, or did and made the Debtor ineligible for chapter 13 relief. In either case, Schaller failed in his duty to the Debtor and to the court to make accurate representations on the Debtor's behalf.

2.      *Nonetheless, Schaller Filed or Caused to Be Filed a Chapter 13 Case on Behalf of the Debtor*

There is no question that, based on the Schedules on file in this Case, the Debtor was ineligible for chapter 13 relief, as set forth above. Tabor II was dismissed on that and other grounds.

Yet the Tabor I and Tabor II petitions were in fact filed by the Schaller Firm.

In both Tabor I and Tabor II, all the documents filed with the court were filed under the CM/ECF account of Oreluk, as an associate with the Schaller Firm. Most of those documents indicate that Oreluk, as an associate with the Schaller Firm, was counsel to the Debtor. Under the circumstances here, the court would have little hesitancy finding that Oreluk was the Debtor's attorney and therefore the preceding failures are attributable to him. Were this a Bankruptcy Rule 9011 matter targeting Oreluk, the court would per the express terms thereunder also hold the Schaller Firm liable for any violations of Bankruptcy Rule 9011 by Oreluk. Fed. R. Bankr. P. 9011(c)(1)(A) ("Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.").

Schaller, of course, is not Oreluk nor the Schaller Firm *per se*. As founder, president and sole partner of the Schaller Firm, Schaller was Oreluk's boss and direct supervisor. Tr. at pp. 16-17, Nov. 27, 2017. Any liability of the Schaller Firm would ultimately be borne by Schaller indirectly. The question here though is whether Schaller can be directly liable.

This is in part where the flexibility of section 105 comes into play. As noted above, section 105 assists in cutting through multiplicitous proceedings, simplifying the matter. Can it, however, be used to assess liability to Schaller for Oreluk's conduct?

The court concludes that it can.

Section 105(a) expressly affords the bankruptcy court the ability to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *Caesars*, 808 F.3d at 1188-89 (bankruptcy court may use section 105 to further the Bankruptcy Code's "central objectives"). As shown, attorney behavior issues are central to the

objectives of the bankruptcy system, and these facts lay bare a gap in the coverage of the statutes and rules that section 105 enables the court to fill. As the bankruptcy court in *Rimsat* stated:

> For one reason or another, the traditional tools available for imposing sanctions against [a party] and its attorneys are not completely adequate to address the conduct at issue. As a result, the court finds it necessary to rely upon the broad equitable powers given to bankruptcy courts by § 105(a) and upon its inherent power to impose sanctions for the bad faith conduct of litigation to fill in the gaps. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

*In re Rimsat, Ltd.,* 229 B.R. 914, 921 (Bankr. N.D. Ind. 1998), *aff'd,* 230 B.R. 362 (N.D. Ind. 1999), *aff'd,* 212 F.3d 1039 (7th Cir. 2000).

Here, the court determines that it is both necessary and appropriate to hold Schaller responsible for the conduct of Oreluk and the others in Schaller Firm, as the evidence presented to the court at the Trial convincingly shows:

> That the solicitation to the Debtor was from the Schaller Firm, not Oreluk. Tr. at p. 70, Nov. 6, 2017. That that solicitation, promising "instant relief and peace of mind" was designed by Schaller and sent out under his direction. Tr. at p. 73, Nov. 6, 2017. Oreluk was not in any way substantively involved in crafting or sending solicitations out to potential clients. Tr. at pp. 74-75, Nov. 27, 2017;

> That the Case was filed by Schaller, not Oreluk, though it was filed from Oreluk's CM/ECF account. In 2015, Schaller had in place office procedures specifying that Oreluk file every bankruptcy case. Tr. at p. 52, Nov. 27, 2017. In 2015, all of the Schaller Firm's cases were filed using Oreluk's CM/ECF account, Tr. at p. 30, Nov. 27, 2017, though Oreluk personally did not begin filing bankruptcy cases until January of 2016. Tr. at p. 52, Nov. 27, 2017;

> That Schaller was Oreluk's immediate supervisor, establishing and communicating office procedures. Tr. at pp. 16-17, Nov. 27, 2017. Oreluk had limited discretion to alter office policy and protocol. Tr. at pp. 22-23, Nov. 27, 2017. Schaller was in control of the Schaller Firm. Tr. at p. 40, Nov. 6, 2017;

> That Oreluk bore no relation to the Debtor other than being the attorney at the Schaller Firm who, by luck of the draw, was assigned the Debtor's case. *See* Tr. at pp. 86-87, Nov. 27, 2017;

> That the Debtor considered Schaller to be his attorney. Tr. at pp. 89-90, Nov. 6, 2017. Schaller spoke to the Debtor on the phone and confirmed his desire to file Tabor II. Tr. at p. 90, Nov. 6, 2017. The Debtor addressed his August 30, 2015 letter to the Schaller Firm, not to Oreluk. U.S. Trustee Exh. No. 24. In correspondence from Schaller to the Debtor, Schaller identified himself as the Debtor's attorney. U.S. Trustee Exh. No. 33;

33

That the procedures and policies followed by Oreluk and others at the
Schaller Firm had been designed by Schaller and implemented at his
direction. Tr. at pp. 18-19, Nov. 27, 2017. That the Surrender Method
approach to cases in general was by the design of Schaller. Tr. at pp. 48-49,
54-55, Nov. 27, 2017;

That the Debtor, by Schaller's own testimony, was hesitant to file Tabor II
and only after discussing the matter with Schaller did the Debtor authorize
the filing. Tr. at p. 89-90, Nov. 6, 2017; and

That the Schaller Firm, not Oreluk directly, was paid for representing the
Debtor. Tabor I, Dkt. No. 13-3; Tr. at p. 142, Nov. 6, 2017.

Nothing in the record before the court demonstrated a proper bankruptcy motive behind
the filings of Tabor I and Tabor II, and neither the U.S. Trustee nor Schaller called the Debtor to
testify. That testimony might have evidenced a desire to reorganize beyond the facially invalid
attempt to delay the mortgage creditors. In the absence of that testimony, the record speaks for
itself. Two ineligible cases in succession, one dismissed for failure to comply with the filing
requirements of the Bankruptcy Code and one dismissed for ineligibility and failure to make Plan
payments. Each the product of a system designed by Schaller to delay foreclosures but not to
legitimately invoke bankruptcy relief. These filings were improper.

Under the totality of these circumstances, there is little doubt that it was Schaller who caused
the ineligible cases to be filed. Schaller cannot escape blame by laying off his responsibilities on his
associates.

3.    *The Reason the Ineligible Cases Were Filed and Liability Therefore*

Despite all of the foregoing, the court cannot—nor does it need to—conclude that it was
financial gain that motivated the improper petitions. None of the standards analyzed above require
the court to determine the motivation of the attorney behind an improperly motivated bankruptcy
case.

The reason the Tabor I and Tabor II cases were filed is abundantly clear from the record.
They were filed as a product of Schaller's Surrender Method approach to chapter 13 bankruptcies,
designed to delay the collection efforts of the Debtor's mortgage holders. There is no need to look
to Schaller's profit motive as the underlying, primary motive herein.

The ineligible filings for the purposes of delaying collection would be, if this were an action
under Bankruptcy Rule 9011(b)(1) or for bad faith dismissal under section 1307(c), enough. Under
these circumstances, those improprieties redound upon the attorney who orchestrated the deficient
filings.

The court therefore concludes that Schaller's causing the ineligible Tabor I and Tabor II
cases to be filed was improper and merits redress under section 105(a).

B.    Claim 2

The U.S. Trustee outlines in "Claim 2" that

Robert Schaller advertised to financially desperate and vulnerable potential clients that he knew to be on the precipice of losing their homes, including Elton Tabor, and made misleading and illusory claims in such advertisements, including the premise of a "DEADLINE TO SAVE YOUR HOME." In fact, when Robert Schaller sent such advertisements to Mr. Tabor and others, he had no intention of 'saving' their homes. Robert Schaller's intention was to propose and confirm a Chapter 13 plan that either did not address the mortgage obligations, or provided for the surrender of the home. This is what is known as Schaller's "Surrender Method" Chapter 13 case. The practical purpose of the Surrender Method is to achieve enough delay with the automatic stay so that sufficient payments can be made for the Trustee to disburse to Robert Schaller for an attorney fee. The theoretical idea is that the client will negotiate, *pro se*, a modification of their home loan. Although Robert Schaller almost always uses the Court-Approved Retention Agreement in Surrender Method cases, and although he is fully aware that Paragraph 16 has been interpreted to include negotiations with secured lenders, he often causes Surrender Method clients to execute side agreements absolving him of any responsibility concerning the mortgage modification component of the approach he counsels. In other words, Schaller markets to prospective clients facing a challenge with a particular debt (their home mortgage); prospective clients seek Schaller's assistance in dealing with that challenge, and Schaller sells a substantial number of prospective clients a Chapter 13 bankruptcy case that proposes to resolve all debts *except the one that led them to him in the first place.*

U.S. Trustee's Pretrial Stmt., at pp. 1-2 (footnote omitted). In addressing the U.S. Trustee's Claim this court must consider whether Schaller's actions fall under the ambit of this court generally and the matter before the court specifically.

It appears here that the U.S. Trustee seeks a ruling that the Surrender Method is impermissible, that in implementing the Surrender Method, Schaller has taken advantage of an at-risk demographic and that Schaller has violated the terms of the CARA. Each of the former two requests appear beyond the scope of this Case and the middle request appears to veer into the territory of professional responsibility. Only the last request appears squarely before the court, and that too has issues.

The court will consider each request in turn.

1.    *The Propriety of the Surrender Method*

The court has addressed the pitfalls of the Surrender Method in addressing Claim 1. There, the court was careful not to make broad-sweeping statements about its propriety. Even though it is abundantly clear that the sole purpose of this Case, a Surrender Method case, was to buy time through the protection of the automatic stay, the court cannot conclude on the record before it that every Surrender Method case is equally flawed.

35

As Judge Schmetterer has stated, "the [c]ourt must be careful not to deny the protection of the Bankruptcy Code to a debtor whose legitimate efforts at financial rehabilitation may be hidden among derivative benefits (such as the delay of creditors resulting from the automatic stay) that, if viewed alone, might suggest bad faith." *Strug-Div.*, 375 B.R. at 449.

Schaller is correct that the Bankruptcy Code does permit surrender of property under a chapter 13 plan. 11 U.S.C. § 1325(a)(5)(C). Schaller is also, presumably, correct that judges in this district have approved plans in cases filed by him which fall into the category of what the U.S. Trustee calls the Surrender Method. That the latter has occurred does notmake it right, in much the same way that this court cannot, as discussed below, require Schaller to defer from conduct only a single judge has disproved, unless it is clear the others would as well. The fact that the former is an option does not permit a debtor to file intentionally deficient plans knowing that they can be corrected with that option later.

Here, the implementation of the Surrender Method was flawed from the outset. The Debtor was ineligible for chapter 13 relief. Further, as discussed below, the chapter 13 plan filed for the Debtor in Tabor II failed to properly address the central issues in the Case: the mortgages and properties. Also, as discussed below, the Schedules were slapdash in nature. These, and the other failures noted above, made Tabor I and Tabor II doomed to fail, and speak poorly of the Surrender Method. As implemented in these cases, the Surrender Method was inappropriate.

The court cannot conclude more generally than that, however. As noted at the outset, this matter has always been focused on the facts of Tabor I and Tabor II. What has gone on in other cases might help explain what happened here, but it is not the focus of this matter. For that reason, the court cannot give the U.S. Trustee what they seek here. Propriety must be determined on a case-by-case basis, under the totality of the circumstances in each case at hand.

2.    *The Professional Responsibility Allegations*

At the Trial, Schaller testified that the correspondence he originally sent the Debtor was sent by him through a mailing service. Tr. at p. 70, Nov. 16, 2017. Schaller explained that the letter in question was "just one of hundreds—hundreds and hundreds of letters that we sent out on the same day." *Id.* at 71. Schaller acknowledged that at the time of the mailing he had no idea whether it was possible to save the Debtor's home. *See id.* at p. 73. The Debtor, "[was] just on a mailing list of people in foreclosure." *Id.* at p. 73. He also acknowledged that "most of these people are unsophisticated." Tr. at p. 73, Nov. 6, 2017.

Yet the correspondence in question arguably creates the impression that Schaller is offering to help save the home, with statements such as "Deadline to Save Your Home" appearing multiple times, "Instant Relief & Peace of Mind" and "protect your home." U.S. Trustee Exh. No. 22. Further, Schaller guarantees to stop the sheriff sale. *Id.* That is promise he might technically fulfill by delaying the scheduled sale, but in this Case, that technical fulfillment is a distinction with no real difference. The ultimate result, loss of the Debtor's home to the mortgage holder by sheriff's sale, is exactly what occurred. U.S. Trustee Exh. No. 30. Further, because Tabor II was unsuccessful, the Debtor lost the ability to address therein the $517,749.84 deficiency assessed in the sheriff's sale. *See id.* At the very least, the correspondence appears likely to create unjustified expectations in the results that will be achieved.

Schaller's solicitation of the Debtor is troubling on other levels. In it, for example, he offers a "$500 Coupon" that, according to its terms, acts as a discount off of the client's retainer if certain conditions are met. U.S. Trustee Exh. No. 22. The court questions whether clients truly understand that, if it works as advertised, this is a discount solely off of the amount required to be paid up front as opposed to later, not off of the price of the legal services offered. Whether it works as advertised is another matter. At the Trial, Schaller testified that he had no set retainer, stating that "I would try to distinguish between the level of the difficulty of the case. If you have, for example, a business Chapter 13 case, maybe it would be more.  If you had a simple Chapter 7, it might be less. *So that would all depend on each case.*" Tr. at p. 75, Nov. 6, 2017 (emphasis added). An offer to discount from an unspecified and undefined amount is potentially an empty one.

In particular, the court cannot help being struck by the similarities between this Case and *In re Komar*, an Illinois Supreme Court case involving a solicitation. 532 N.E.2d 801, 807 (Ill. 1988). In *Komar*, where a lawyer sent a mailing that included statements guaranteeing to save a potential client's home, the Illinois Supreme Court found that the solicitation was misleading and contained deceptive statements. *Id.* The court took particular issue that the lawyer intentionally directed his solicitations to "unemployed, minimally educated, unsophisticated and distraught" potential clients who feared the imminent loss of their homes by foreclosure, finding that the solicitations contained statements that created an unrealistic sense of urgency and illusory assurances that the potential client would be able to receive the relief promised through the solicitation. *Id.*

Each of the foregoing appears to implicate rules governing professional responsibility in Illinois and in the Northern District of Illinois.

Schaller, as an attorney both licensed in the State of Illinois and admitted to practice before the District Court, answers to both sets of professional responsibility standards. As an Illinois attorney, Schaller must comply with the Illinois Rules of Professional Conduct (the "IL RPC"), Ill. Sup. Ct. R. Art. VIII (amended eff. Jan. 1, 2016). In the District Court and this court, Schaller must abide by the Northern District of Illinois Rules of Professional Conduct. N.D. Ill. R. 83.50 (the "NDIL RPC").

In Illinois, the Supreme Court of Illinois has historically supervised attorney conduct by administering the IL RPC, noting that "[v]iolation of these rules is grounds for discipline." *Cripe v. Leiter*, 703 N.E.2d 100, 105 (Ill. 1998). In the Northern District of Illinois, the District Court has put into place the NDIL Disciplinary Rules and has historically supervised attorney conduct before both it and the bankruptcy court. Except as delegated to the bankruptcy court in the Bankruptcy Court Disciplinary Rules, this is authority that is more appropriately brought to the attention of the District Court.

Traditionally, when this court has observed the potential violation of the IL RPC or the NDIL RPC, it has noted the same but left the enforcement to the relevant body. As the matter before the court today is not one under the Bankruptcy Court Disciplinary Rules and the U.S. Trustee's focus has not been sufficiently on this issue, the court sees no reason herein to take a different course of action.

3.    *Violations of the CARA*

The U.S. Trustee alleges that Schaller utilized what the U.S. Trustee refers to as the "Surrender Method." Further, the U.S. Trustee alleges that Schaller "causes Surrender Method clients to execute side agreements absolving him of any responsibility concerning the mortgage modification." U.S. Trustee's Pretrial Stmt., at p. 2.

This District has adopted a flat fee arrangement or what has become commonly known as the "no look" fees because, if all of the conditions are met, the debtor's counsel becomes eligible for an award of fees without the need for lawyers to submit a detailed application of services required by Bankruptcy Rule 2016(a). *Gilliam*, 2018 WL 1582481, at *6-7; *cf. Messner v. Commerce Bank/Harrisburg, N.A. (In re Smith)*, 331 B.R. 622, 629 (Bankr. M.D. Pa. 2005). This flat fee arrangement requires the attorney to execute a "Rights and Responsibilities" agreement between the attorney and the debtor detailing the obligation of both parties. The choice to enter into a flat fee agreement signifies not only an agreement with the debtor but also with the court. *Gilliam*, 2018 WL 1582481, at *6-7, 10. The current iteration of the CARA specifically states that, "[t]he terms of this court-approved agreement take the place of any conflicting provision in an earlier agreement. This agreement cannot be modified in any way by other agreements. Any provision of another agreement between the debtor and the attorney that conflicts with this agreement is void." CARA, at p. 1; *see also Gilliam*, 2018 WL 1582481, at *10.

Schaller does not dispute that he required that the Debtor execute a separate agreement outside of the CARA. The agreement specifically stated, "Schaller Law Firm is not providing any legal services relating to any loan modification request" and "No assistance shall be provided regarding a loan modification." U.S. Trustee Exh. No. 10. It further provided that the Debtor authorized the Schaller Firm "to agree to the entry of an order lifting the automatic stay." *Id.*

Each of these is troubling, but the court cannot conclude on the facts before it that either of these violates the terms of the CARA or "no look" fee procedures.

With respect to the loan modification, its true that the CARA requires counsel thereunder to "represent the debtor on all matters arising in the case... ." CARA, at p. 3, ¶ 17. At least one judge of this court has found that provision to require the attorney thereunder to assist in a forbearance agreement that was part of the strategy to save the debtor's home. *In re Gage*, 394 B.R. 184, 194 (Bankr. N.D. Ill. 2008) (Squires, J.).

While the court could make much of *Gage* and the fact that Schaller was the attorney who was the court's concern therein, the court believes the U.S. Trustee's argument here stretches the bounds of what is meant by this provision of the CARA. Matters arising in the case are traditionally just that, those that happen within the four walls of the bankruptcy case. When a debtor is in bankruptcy, virtually every legal issue the debtor faces has an impact on the bankruptcy. Debtors' lawyers need not, however, represent a debtor on all such matters. Further, all claims are subject to renegotiation. Being engaged as a debtor's bankruptcy lawyer, without more, cannot put an affirmative duty on counsel to conduct those negotiations on behalf of the debtor.

True, a distinction might be drawn that, as in *Gage*, the renegotiation here is central to the debtor's case and thus included within those duties. But the court cannot in clear conscious sanction Schaller for failing to follow the opinion of one judge in this matter, in a jurisdiction where

a single judge's opinion is not controlling. If the bankruptcy court determines to expressly include mortgage renegotiations within the duties in the CARA, it is best done by the court as a whole and unequivocally, not through catchall language.

For similar reason, the court cannot conclude that the agreement in relation to the automatic stay is invalid. True, the CARA requires the counsel to "[t]imely respond to motions for relief from stay." CARA, at p. 3, ¶ 14. Schaller's side agreement does not, however, appear to relieve him of the duty to respond. Instead, it appears only to authorize his response to be acquiescence.

C.    Claim 3

Claim 3 states, in pertinent part, that:

> The Chapter 13 plan prepared and filed for Elton Tabor in Case No. 15-26544 was filed in bad faith. It had no chance for success, and Robert Schaller knew, or should have known this. The plan was premised on deriving income from real properties, without addressing the mortgage payments and taxes for those properties.

U.S. Trustee's Pretrial Stmt., at p. 3.

This Claim challenges the good faith required by section 1325(a)(3), which is different from the good faith requirement in commencing cases implicit in section 1307(c), as discussed above. Under section 1325(a)(3), as a condition for confirmation of a chapter 13 plan, the court must find that "the plan has been proposed in good faith and not by any means forbidden by law," 11 U.S.C. § 1325(a)(3), and that "the action of the debtor in filing the petition was in good faith." 11 U.S.C. § 1325(a)(7).

Unlike good faith under section 1307(c), the use of good faith in this context is expressly per the statute. However, good faith is "neither defined in the statute nor discussed in the legislative history." *In re Schaitz*, 913 F. 2d 452, 453 (7th Cir. 1990). In determining whether a plan is filed in good faith, the court is tasked with questioning whether the debtor is "really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them?" *Id.*

The Seventh Circuit has stated in this context that "'[g]ood faith' will have to be defined on a case-by-case basis as the courts encounter various problems in the administration of Chapter 13's provisions." *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 431 (7th Cir. 1982) (quotations omitted). "[A] comprehensive definition of good faith is not practical.'" *Id.* at 431 (*quoting Tenney v. Terry (In re Terry)*, 630 F.2d 634, 635 (8th Cir. 1980)). Factors useful for identifying good faith include (a) whether the proposed plan states the debtor's secured and unsecured debts accurately; (b) whether the proposed plan states debtor's expenses accurately; (c) if the percentage of repayment of unsecured claims is correct; (d) if inaccuracies in the plan, if any, amount to an attempt to mislead the bankruptcy court; and (e) whether proposed payments indicate a fundamental fairness in dealing with one's creditors. *Id.* at 432-33.

As with the analysis under section 1307(c), "[t]hese broad sets of factors ultimately merge into a generic 'totality of the circumstances' test." *In re Smith*, 848 F.2d 813, 818 (7th Cir. 1988).

The U.S. Trustee asserts that the Plan filed in Tabor II was fundamentally flawed. This position is premised on the fact that, "[t]he plan relies on the collection of rent from the Kedzie

Property—and simultaneously provides for no payments to be made to the secured lender holding the mortgage on that property." U.S. Trustee's Closing Argument, at p. 70; *see* U.S. Trustee Exh. No. 2(b). Further, the Debtor's Schedule J lists $1,500.00 as a housing expense, not accounting for whether this amount is for the Kedzie Property or the 64th Street Property. U.S. Trustee's Closing Argument, at p. 70. The U.S. Trustee also notes that the Plan lacks separate amounts for real estate taxes or insurance. Finally, the U.S. Trustee states that even given the potential mortgage modification of 60% off the amount owed, the total housing expense (principal, interest, insurance, and taxes) would still be far in excess of $1,500.00. *Id.* The U.S. Trustee concludes that the inherently flawed nature of this Plan only served one purpose, which was "to achieve enough delay that Schaller could be paid before stay relief was granted." *Id.*

Schaller challenges the U.S. Trustee's allegations by asserting that his former associate Oreluk "made the ... mistake of lowering the plan payment because he had gotten the value of the property mixed up in his mind." Schaller's Closing Argument, at p. 156. Schaller also asserts that a client who chooses to negotiate a *pro se* loan modification "was well aware that if the lender did object to the plan and moved to lift the automatic stay, the debtor would have no defense, [and] in such circumstances was willing to surrender the property." *Id.* In all, Schaller's defense hinges on the assertion that a plan that lacks good faith is acceptable if the client is informed of its deficiencies and if those deficiencies can be fixed when challenged.

This matter is complicated by the lack of testimony from the Debtor. Schaller correctly notes that the U.S. Trustee did not offer testimony from the Debtor. On the other hand, Schaller might have benefited from that testimony, but also did not call him. A determination of good faith under section 1325 is not the same as, for example, some of the determinations to be made under section 727. *See, e.g.,* 11 U.S.C. § 727 (a)(4)(A) ("debtor knowingly and fraudulently... made a false oath or account."). While a debtor's intent may be relevant and her testimony germane, the totality of the circumstances can dictate a finding of bad faith even in the absence of that testimony or an evidentiary hearing. *Marshall v. Blake,* Case No. 17-2809, — F.3d —, 2018 WL 1417550, at *13 (7th Cir. Mar. 22, 2018) (concluding that "'[n]othing in the statutes or case law requires a hearing every time the issue of good faith is raised in a Chapter 13 proceeding. The bankruptcy court, exercising its sound discretion, is in the best position to determine when an evidentiary hearing on the issue of good faith is necessary.'") (*quoting Noreen v. Slattengren,* 974 F.2d 75, 76 (8th Cir. 1992)).

Here, the Debtor's testimony was unnecessary as the Plan lacks good faith on its face.

Even a cursory examination of the Plan reveals:

> That the Plan fails to state the Debtor's secured debts accurately. The Debtor's Schedules A & D reflect the Debtor's two Properties and secured creditors in relation thereto, but the Plan provides treatment of none. Section C of the Plan indicates no creditors who will be paid directly, yet Sections E(2), E(3.1), E(3.2) and E(5) reflect no treatment of secured creditors under the Plan. The only mention of any secured creditor takes place in Section G(2), which provides that "[t]he Chapter 13 trustee shall make NO payments to mortgagee JPMorgan Chase on its secured claim in accordance with 11 U.S.C. § 1325(a)(5)(A). Mortgagee holds a security interest in debtor(s)' real property listing in Schedule A and commonly known as 3419 N. Kedzie Ave., Chicago, IL 60618." Section 1325(a)(5)(A) is

40

the provision for treatment in plans by agreement, but there was no
agreement with JPMorgan Chase. No mention at all of Sun West Mortgage
Company, Inc., is made in the Plan;

That the Plan fails to accurately depict the Debtor's income and expenses.
The Plan in Section A(1)(c) states that the Debtor's total monthly household
income is $3,137.98. This is derived from the Debtor's Schedule I, which
states that the Debtor had a monthly income comprised of rent ($2,250.00),
social security ($800.00) and pension/retirement ($87.98). The Debtor's
Schedule J reflects monthly expenses, excluding rent/mortgage payments, of
over $1,000.00. Without the rent income, the Plan is unfeasible. Yet nothing
in the Plan in any way acts to preserve the income upon which the Plan is
predicated;

That, considering these omissions, the Plan is unfeasible is something that
Schaller knew or should have known. The Plan, invalid on its face, does not
further any legitimate goal of bankruptcy relief and serves only the purpose
of misleading all parties into believing the plan requirement has been fulfilled,
thus prolonging the case inappropriately; and

That taken in light of the foregoing, the Plan does not propose payments to
the Debtor's creditors in a fundamentally fair way.

Schaller agrees that determining the good faith of a chapter 13 plan is a fact intensive
evaluation requiring the court to use a totality of the circumstances approach. Schaller's central
argument is, however, that while the filing of a petition in bad faith may lead to dismissal, the filing
of a plan in bad faith does not lead to the same result. Schaller relies on *Smith* for the proposition
that a good faith inquiry is not derived from an evaluation of specific amounts or percentages to
unsecured creditors because that issue is addressed in section 1325(b). *Smith*, 848 F.2d at 821.
Schaller also argues that section 727(a)(4)(A) guides the analysis of good faith, which requires a
debtor to knowingly and fraudulently have made a false oath. Finally, Schaller decries the lack of
testimony from the Debtor, arguing that without it, the court cannot conclude a lack of good faith.

These arguments are unavailing. The court has previously discussed both the distinction
between sections 727(a)(4)(A) and 1325 of the Bankruptcy Code. In so doing, the court concluded
that an analysis under the totality of the circumstances test can dictate a finding of bad faith even in
the absence of a debtor's testimony or an evidentiary hearing. *Blake*, 2018 WL 1417550, at *13. In
that regard, the court also considered the Debtor's lack of availability and concluded that the totality
of the circumstances dictated a finding of lack of good faith. The record speaks for itself.

Last, Schaller has misread the holding in *Smith*. True, the *Smith* court did conclude that a
plan could be proposed in good faith even though payment percentages to unsecured creditors
might be miscalculated. *Smith*, 848 F.2d at 820. That, however, is not a license to intentionally fail
to address known creditors and their rights. *Rimgale*, 669 F.2d at 431-32 (inviting the court to
consider the "fundamental fairness" with which a plan deals with a debtor's creditors).

41

Considering the totality of the circumstances, the court therefore concludes that the Plan was not proposed in good faith, and that failure redounds upon Schaller as much if not more than it does upon the Debtor.

D.     Claim 4

Claim 4 states, in pertinent part, that

> To reduce the amount of time spent on each bankruptcy file, Robert Schaller created a set of prefabricated answers for certain fields on Schedule B, and caused his clients, including Elton Tabor, to execute these documents under penalty of perjury. This resulted in inaccurate schedules being filed with the Court. Robert Schaller attempts to insulate himself from responsibility for the foreseeable inaccuracies by relying on debtors' execution of the schedules under penalty of perjury, and the debtors' testimony at the creditors' meeting affirming the accuracy of the schedules.

U.S. Trustee's Pretrial Stmt., at p. 3.

In a legitimate bankruptcy case, the accuracy of the information provided by the Debtor is crucial to the success of the case. The Fifth Circuit has noted "the guiding principle that 'the integrity of the bankruptcy system depends on full and honest disclosure' by debtors and that 'it is very important that a debtor's bankruptcy schedules and statement of affairs be as accurate as possible.'" *ASARCO, L.L.C. v. Montana Res., Inc.*, 858 F.3d 949, 958 (5th Cir. 2017) (citation omitted). The courts in this Circuit agree. *In re Gonzalez*, Case No. 99-80751, 2001 WL 34076427, at *2 (Bankr. C.D. Ill. Aug. 22, 2001) ("[A] debtor's duty to disclose fully and accurately all legal or equitable interests in property as of the commencement of the case, whatever their nature, on the bankruptcy schedules is paramount and absolute.") (*citing In re Yonikus*, 996 F.2d 866 (7th Cir. 1993)); *In re McNichols*, 254 B.R. 422, 432 (Bankr. N.D. Ill. 2000) (Squires, J.) ("The importance of a debtor's actual income and expenses in Chapter 13 cases cannot be overstated.").

The Bankruptcy Rules, which are promulgated by the Supreme Court, make this clear. Bankruptcy Rule 1008 requires that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746." Fed. R. Bankr. P. 1008. Further, Bankruptcy Rule 9011 enforces this requirement, providing that when "presenting to the court a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Fed. R. Bankr. P. 9011.

Locally, the CARA mandates that attorneys "personally review with the debtor and sign the completed petition, plan, statements, and schedules, as well as all amendments thereto, whether filed with the petition or later." *See* CARA, at p. 2.

In this Case, the Schedules filed by the Debtor were defective. The Debtor's Schedule B contained $8,120.00 in personal property, consisting in pertinent part of:

a.     Cash on hand of $20.00 (Line 1);

b.     "miscellaneous household goods and furnishings--estimated value" of $850.00 (Line 4);

    c.    "miscellaneous books, pictures, family photos, etc." with a value of $250.00 (Line 5);

    d.    "wearing apparel" with a value of $775.00 (Line 6);

    e.    "miscellaneous items" in the category of furs and jewelry with a value of $300.00 (Line 7); and

    f.    "miscellaneous assets, including any unliquidated tax refund(s), if any" valued at $300.00 (Line 35).

The U.S. Trustee alleges that these amounts are the product of Schaller's use of prefabricated answers for lines 1, 4, 5, 6, 7, 8, 9 and 35 on Schedule B. The evidence supports that allegation.

When deposed prior to the Trial, Schaller stated that reviewing schedules with a client is "one of the more time-consuming parts of [a traditional bankruptcy] case." U.S. Trustee Exh. No. 45 at p. 64. When questioned at the Trial on whether he used prefabricated schedules for his clients Schaller stated the following:

    Q.    Mr. Schaller, did you provide your clients with a document that had lines 1, 4, 5, 6, 7, 8, 9, and 35 of the official form schedule B with answers that you had come up with?

    A.    It depends what happened at the intake meeting. If, at the intake meeting, there was no change to these particular categories, then yes. If there were changes at the initial intake, then no.

    Q.    Mr. Schaller, you provided default answers for these fields, correct?

    A.    If the debtor had not identified different numbers at the intake, yes.

Tr. at p. 28, Nov. 7, 2017. Fabinski also testified that Schedule B had prepopulated fields. Tr. at p. 179, Nov. 27, 2017.

Later, Schaller attempted to deflect from this approach, arguing that the numbers were simply there to guide the conversation with debtors.

    Q.    Do you think – did you think, when you created the baseline numbers, that the debtors being unfamiliar with the schedules and on those items that are – on those eight categories, due to the nature of those categories, that they were likely to seek your help in getting the answer?

    A.    Yes.

Tr. at p. 29, Nov. 8, 2017.

Schaller also argued that his associates were instructed to insert actual numbers if debtors had provided data to the contrary, stating that "[i]f the numbers on the datasheet were different than

the baseline numbers, then you would change the numbers in the Schedule B to what the debtors have on those numbers." *Id.* Schaller further testified that associates were to "review those eight categories with the debtor, and then also, at the follow-up meeting approximately a week later, they would review it again after the schedules were more complete." *Id.*

Schaller's testimony in this regard simply lacked credibility. Not only was Schaller himself unconvincing, the testimony of Schaller's associates contradicts the self-serving positions espoused by Schaller. Oreluk testified that the numbers would be reviewed with the clients either at the intake meeting, if the client was "trying to do everything at once," or later if there was another meeting. Tr. at p. 41, Nov. 27, 2017. Fabinski, on the other hand, testified that all he would put in the Schedule B "were vehicles, bank accounts, retirement accounts, and if they had what we would call assets over $500.00 or more. Everything else was just pre-set, you could say." *Id.* at p. 180. Oreluk further testified that he did not check to see if the other attorneys had checked with the clients regarding the pre-filled items. *Id.* at 60.

This pre-filling of the schedules is dangerous and could possibly have been rectified had there been a true control in place ensuring that debtors ratified the numbers. Schaller testified that he put into place a datasheet to inquire as to what the contents of the schedules should in fact be, and that his associates would go over the datasheet with each debtor then again to confirm the answers in the completed schedule with each debtor. Tr. at p. 233, Nov. 6, 2017; Tr. at pp. 18-23, 38-42, Nov. 7, 2017; *see also* U.S. Trustee Exh. No. 9 (Tabor I datasheet). However, as noted above, Oreluk and Fabinksi testified to different approaches to these same controls. For example, Oreluk testified that he would question the contents of a datasheet only if there was an indication the client was being uncooperative or lazy. Tr. at p. 37, Nov. 27, 2017.

Further, there appeared to be no true compliance with the CARA requirement that the attorney "personally review with the debtor and sign the completed petition, plan, statements, and schedules." *See* CARA, at p. 2. Fabinksi testified that clients never returned to the office to review the schedules with the lawyers. Instead, the documents were simply emailed to clients for signature, Tr. at pp. 58-60, Nov. 27, 2017, using an email drafted by Schaller and given to his associates to solicit signatures with. Tr. at p. 218, Nov. 6, 2017. At no time does it appear that any attorney from the Schaller Firm personally reviewed the completed schedules with debtors.

This lack of control appears to have manifested itself in Tabor I and Tabor II. A datasheet exists for Tabor I, U.S. Trustee Exh. No. 9, but none apparently for Tabor II. Further, the Tabor I datasheet is blank in the area for a listing of personal property. Yet the default, pre-filled numbers made their way onto lines 1, 4-7 and 35 on Schedule B.

This happened an alarming number of times. U.S. Trustee Exh. No. 1(a) ("the Summary Chart") summarizes these aspects of schedule Bs in all bankruptcy cases filed by the Schaller Firm during the years 2013, 2014 and 2015. As the Summary Chart shows, an overwhelming number of the petitions filed by Schaller include the same amounts as were submitted here, for example cash ($20.00), household goods ($250.00) and clothing ($775.00).

Schaller's use of pre-filled schedules strikes to the very heart of bankruptcy disclosures. Here it is the Debtor, not the attorney, that must provide the values. *See* Fed. R. Bankr. P. 1008. Schaller is correct that debtors may seek advice of counsel in formulating their response, the

evidence indicates that Schaller's practice has gone beyond advising debtors. He is, in fact, testifying for them.

Once again, had the Debtor testified, it is possible that he might have ratified the amounts in the Schedules and the court would have to consider the Debtor's Schedules in that light. But the Debtor did not testify. In the absence of that testimony, the record speaks for itself. The conduct of the Schaller Firm and thereby Schaller in Tabor I and Tabor II violated Bankruptcy Rule 1008 and, by failing to personally review the Schedules with the Debtor, the express duties of the CARA.

E.    Claim 5

Claim 5 concentrates on the firm culture that Schaller created at the Schaller Firm. The U.S. Trustee maintains that:

> [a]t times relevant, Robert Schaller created a law firm culture that ascribed insufficient priority to (i) the accuracy of sworn schedules filed by Robert Schaller's clients, as evidenced by the various inaccuracies in the schedules of Elton Tabor, and (ii)the manner in which the schedules were presented to Mr. Tabor for review, which was inconsistent with the obligations set forth in the Court-Approved Retention Agreement.

U.S Trustee's Pretrial Statement, at p. 3.

Schaller testified at the Trial that the processes he established as principal of the Schaller Firm were "very thorough." Tr. at p. 17, Nov. 7, 2017. Throughout his testimony, Schaller described in great detail the practices and procedures he established. The evidentiary record, however, paints a different picture of the practices and procedures of the Schaller Firm.

It is not necessary to restate here the multiple issues noted above, for two reasons. First, if Tabor I and Tabor II are illustrative of the practices and procedures of the Schaller Firm, then it is a simple conclusion that Schaller's practices and procedures fall outside of acceptable practices and procedures in this District and elsewhere.

Second, however, this matter is not about Schaller's law firm culture. The court cannot see a cognizable claim here in relation to the Tabor I and Tabor II cases. The individual failures, including the ones pointed out by the U.S. Trustee in this Claim, have previously been addressed. The culture might explain these failures but does not stand alone as a cause of action in a matter of this scope.

The relevance, of course, may be in connecting Schaller personally to the actions of the Schaller Firm and the lawyers working there. If that is the purpose and as it may be necessary to restate it here, the court reiterates its earlier conclusion with respect to Claim 1: Under the totality of these circumstances, there is little doubt that it was Schaller who is ultimately responsible for the failure set forth herein. Schaller cannot escape blame by laying off his responsibilities on his associates.

REMEDIES

Having found that Schaller is responsible for some, but not all, of the Claims asserted by the U.S. Trustee, the question then becomes what remedy should be afforded. As noted above, the U.S. Trustee seeks here: (1) refund of all fees collected from the Debtor in the Tabor I and Tabor II matters; (2) a sanction of $5,000.00 or more against Schaller for his alleged conduct; and (3) reimbursement of the U.S. Trustee's fees and costs.

The court has previously concluded that it will not in a matter of this nature order the second remedy, as that appears more punitive than remedial. Some courts, in matters such as these, have also refused to order a refund of the fees at issue. In *Snyder*, the court found no cause to order the counsel to return fees to the debtor, stating that "[h]e got what he paid for. He wanted to stiff-arm the creditor until he was eligible for a discharge, and his goal was accomplished. He should not get any money back to encourage such behavior." *Snyder*, 2011 WL 612254, at *2.

Such an approach would not correctly reflect the scenario here. It is not clear what the Debtor wanted as the Debtor did not testify. Schaller's advertisement did speak to delay, and some delay is indeed what the Debtor received. The Debtor did not get the sheriff's sale stopped, as promised, merely delayed. Further, the overall goal was much more likely a desire to save the Debtor's home, as Schaller's advertisements exploit. That might not have been possible even in a legitimate case, but it certainly did not happen here.

Under the circumstances, it is the court's conclusion that compensatory damages must include a refund to the Debtor all of the fees Schaller has collected in Tabor I and Tabor II. By the court's calculation, that amount is $4,432.70.

In the court's determination, compensatory damages require somewhat more. As noted above, however, the Debtor also was assessed a deficiency claim of $517,749.84 on the sheriff sale of the Kedzie Property. U.S. Trustee Exh. No. 30. That amount has every appearance of being dischargeable in a bankruptcy case. Further, the disposition of the 64th Street Property is unclear.[18] As a result, the Debtor appears to be left in need of a further bankruptcy, one that would not be necessary had his previous cases been pursued correctly.

The court will therefore also require Schaller to pay to the Debtor $4,000.00 to allow the Debtor to seek bankruptcy relief, as necessary. The amount of $4,000.00 is the "no look" fee for a chapter 13 case under the CARA. It may be that a subsequent case will cost more or less than that amount, depending on the complexity and bankruptcy chapter of that case. As that is uncertain at this time, $4,000.00 is a fair estimation of the cost.

Finally, the U.S. Trustee's request for its fees and costs in this proceeding will be granted. For the sake of clarity and because it appears that the U.S. Trustee has not pursued this case in the most expeditious of ways, the court will allow fees and expenses beginning with the drafting and submission of the motion to reopen this Case and going forward only, and even then only those fees and costs bearing a direct relation to this Case. The court is aware that the U.S. Trustee is pursuing

---

[18] The court notes that its review of the Debtor's datasheet indicates another, undeveloped property in Little Rock, Arkansas. U.S. Trustee Exh. No. 9, at p. 3 (Tabor I datasheet).

Schaller on what are, essentially, parallel tracks in several cases. This grant of fees and costs does not encompass the U.S. Trustee's fees and costs in those other matters.

Taken together and combined with the publication of this Memorandum Decision, the court concludes that these compensatory damages are derivative from and proportionate in relation to the actions in question in this Case and Schaller's culpability therefore. *Zale*, 239 F.3d at 916-17; *see also United Mine Workers*, 330 U.S. at 298-99; *Shakman*, 533 F.2d at 349-50.

## CONCLUSION

For the foregoing reasons, the court will grant the U.S. Trustee's Motion for Sanctions in the manner described above. This court finds that the U.S. Trustee has met its burden to show by a preponderance of the evidence the need to address the circumstances discussed herein in a proceeding under section 105. The integrity of the bankruptcy process demands nothing less.

A separate order will be issued concurrently with this Memorandum Decision to that effect.

Dated: April 11, 2018

Timothy A. Barnes
United States Bankruptcy Judge